# EXHIBIT A

PLYMOUTH, ss.

SUPERIOR COURT DEPARTMENT OF
THE TRIAL COURT OF THE
COMMONWEALTH
CIVIL ACTION NO.

PLCV 2015-00408-A

Forty Four Windemere LLC, Plaintiff(s)

vs.

Fidelity National Title Insurance Company, Defendant(s)

## SUMMONS

To the above-named defendant:

You are hereby summoned and required to serve upon Mary Secor Sullivan Esq plaintiff attorney, whose address is Box 1873 Vineyard Haven MA 02568, an answer to the complaint and First Amended Complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Brockton either before service upon plaintiff attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff claim or you will thereafter be barred from making such claim in any other action.

Witness, Judith Fabricant, Esquire at Brockton the ...........1st...........day of June..........., in the year of our Lord Two thousand and fifteen.

CLERK.

## NOTES
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. To the plaintiff's attorney: please circle type of action involved-Tort-Motor Vehicle Tort-Contract-Equitable Relief-Other.

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on .......June 5, 2015...., 200 , I served a copy of the within summons together with a copy with a copy of the complaint in this action, upon the within-named defendant , in the following manner(See Mass. R. Civ. P. 4(d)(1-5):...By First Class Mail to:........
Fidelity National Title Insurance Company c/o CT Corporation System at 155 Federal Street, Suite 700, Boston, MA 02110

Dated: 6/5/15 , 200 ..........Stacy Siegan..........

N.B. TO PROCESS SERVER:- STACY SIEGAN, Legal Assistant, DOI

PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

RECEIVED

JUN - 5 2015 , 200

DIVISION OF INSURANCE
LEGAL DIVISION

NOTICE TO DEFENDANT -You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's office at Brockton.

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS                          SUPERIOR COURT C.A.
                                      PLCV 2015-00408-A

FORTY FOUR WINDEMERE LLC, and
JAMES E. SHALEK
          Plaintiffs
V.


LAWYERS TITLE INSURANCE CORPORATION and
FIDELITY NATIONAL TITLE INSURANCE COMPANY
          Defendants

## FIRST AMENDED COMPLAINT PURSUANT TO M.G.L. C.93A and C.176D
UNFAIR CLAIM SETTLEMENT PRACTICES

### I.   *FACTS*

1. The Plaintiff, Forty Four Windemere LLC [44 Windemere] is a
Limited Liability Company organized under Mass. General Laws
Chapter 156C, Section 12, with a principal office located at 354
Pleasant Street, West Bridgewater, Ma 02379. The general
character of the business is real estate investing. 44 Windemere
is an Insured under ALTA Owner's Policy of Insurance
82306-80391861.

2. The Plaintiff, James E. Shalek [Shalek] is an individual
whose principal office is located at 354 Pleasant Street, West
Bridgewater, Ma 02379. James E. Shalek is the Insured under ALTA
Loan Policy of Insurance 4821-03-3200.

3. Lawyers Title Insurance Company was merged into Fidelity
National Title Insurance Company [Fidelity] on or about June
30,2010. Fidelity's principal place of business is located at
601 Riverside Ave., Jacksonville, Fl. Fidelity is licensed by
the Massachusetts Division of Insurance to conduct Title
Insurance business in the Commonwealth for title insurance
policies issued by Lawyers Title Insurance Company to 44
Windemere, Policy Number 82306-80391861 and Shalek, Policy
Number 4821-03-3200.

1

The Plaintiffs restate paragraphs 4.- 35. of Plaintiffs'
Complaint.


FORTY FOUR WINDEMERE LLC, and
JAMES E. SHALEK,
by their attorney,


Mary Secor Sullivan, Esq.
BBO#547032
Law Office of Mary Sullivan
Box 1873
87 Center St.
Tisbury, Ma 02568
508-687-9929
msullivanlaw@gmail.com

Dated: June 1, 2015

PLYMOUTH, SS

SUPERIOR COURT C.A.
PLCV 2015-00408-A

FORTY FOUR WINDEMERE LLC, and
JAMES E. SHALEK
          Plaintiffs

V.

LAWYERS TITLE INSURANCE CORPORATION and
FIDELITY NATIONAL TITLE INSURANCE COMPANY
          Defendants

## COMPLAINT PURSUANT TO M.G.L. C.93A and C.176D UNFAIR CLAIM SETTLEMENT PRACTICES

### I.  *FACTS*

1. The Plaintiff, Forty Four Windemere LLC [44 Windemere] is a Limited Liability Company organized under Mass. General Laws Chapter 156C, Section 12, with a principal office located at 354 Pleasant Street, West Bridgewater, Ma 02379. The general character of the business is real estate investing. 44 Windemere is an Insured under ALTA Owner's Policy of Insurance 82306-80391861.

2. The Plaintiff, James E. Shalek [Shalek]is an individual whose principal office is located at 354 Pleasant Street, West Bridgewater, Ma 02379. James E. Shalek is the Insured under ALTA Loan Policy of Insurance 4821-03-3200.

3. Lawyers Title Insurance Company is a subsidiary of Fidelity National Financial, Inc., a Florida corporation, registered to do business in the Commonwealth of Massachusetts on or about May 19, 2003, with its principal office located at 601 Riverside Ave., Jacksonville,Fl. Fidelity is also licensed by the Massachusetts Division of Insurance to conduct Title Insurance business in the Commonwealth.

4. Sherman H. Starr, Jr. is an Attorney and Agent of Lawyers Title Insurance Company at all relevant times.

5. David D. Merrill, Jr, Esq. is Senior Branch Counsel of Lawyers Title Insurance Company, whose place of business is 265 Franklin Street, 8th Floor, Boston, MA 02110 at all relevant times.

6. Harry M. Wilson, IV is a Senior Claims Counsel of Fidelity, whose place of business is 601 Riverside Avenue-Building Five, Fourth Floor, Jacksonville, Fl 32204 at all relevant times.

7. On December 20, 2006 Decision of Martha's Vineyard Commission DRI 324-M was recorded at Dukes County Registry of Deeds Book 01106 Page 1-27. Said Decision referred to Surveys in the Commissions project file, Proposed Site Plan, which clearly delineate Windemere and Hospital Road relocation. Said Decision required the Martha's Vineyard Hospital to: "... must, consistent with this Decision, apply to the appropriate Town of Oak Bluffs Officers and Boards for any local development permits which may be required by law." Exhibit A. Decision of the Martha's Vineyard Commission DRI 324-M Martha's Vineyard Hospital P. 26.

8. The Martha's Vineyard Hospital obtained a Building Permit for Site Work including the relocation of Hospital and Windemere Roads in April 2008. Exhibit B.

9. On April 13, 2010 Sherman H. Starr, an Attorney and Agent of Lawyers Title Insurance Company informed James E. Shalek, Manager of 44 Windemere Road LLC, that an Owner's Policy of Title Insurance is available to 44 Windemere LLC to protect its interest. Said offer was accepted by James E. Shalek.

10. On April 14, 2010 Lawyer's Title Insurance Company Senior Branch Counsel David D. Merril, Jr. Esq accepts "The deed from Mary Martin dated June 25, 1957 recorded in Dukes County Registry of Deeds as an acceptable start deed...", confirming

2

title search from June 25, 1957 to the inception date of policy .
April 16, 2010.

11. On April 16, 2010 at 3:02 PM Lawyers Title Insurance
Corporation issued an ALTA OWNER'S POLICY; FILE NUMBER
4821-03-3200 FOR $1,175,000.00; POLICY NUMBER 82306-80391861
insuring the estate or interest in land Fee Simple of 44
Windemere LLC at 44 Windemere Road; premium cost $2,537.50.

12. "The ALTA OWNER'S POLICY OF TITLE INSURANCE COVERED RISKS
insured the following:

    2. Any defect in … or encumbrance on the Title. This
Covered Risk includes but is not limited to insurance against
loss from…
(a) A defect in the Title caused by
        (iii) failure of any person or Entity to have authorized
    a transfer or conveyance;

    3. Unmarketable Title.

    4. No right of access to and from the Land…"

13. The Owner's Policy Schedule B does not exclude the Martha's
Vineyard Commission Decision Recorded at Dukes County Registry
of Deeds Book 01106 P. 1.

14. On April 16, 2010 at 3:02 PM Lawyers Title Insurance
Corporation issued an ALTA LOAN POLICY/ FILE NUMBER 4821-03-3200
POLICY NUMBER 82307-80483792 in the POLICY AMOUNT OF $600,000.00
insuring the estate or interest in Land encumbered by the
Insured Mortgage from James E. Shalek to Forty Four Windemere
LLC in the original principle amount of $600,000.00 recorded in
Dukes County Registry of Deeds Book 1208, Page 901.

15. The Loan Policy Schedule B does not exclude the Martha's
Vineyard Commission Decision Recorded at Dukes County Registry
of Deeds Book 01106 P. 1.

3

16. The plaintiff James Shalek restates paragraph 12. above as covered risks for ALTA Loan Policy of Title Insurance and includes the additional risk that the lender James V. Shalek is unable to sell his mortgage to another lender.

17. On May 12, 2014 44 Windemere tendered a claim to Fidelity on the basis of "No right of access to and from the Land" because the Martha's Vineyard Hospital Addition was constructed upon Windemere and Hospital Roads which provided sole public access to 44 Windemere Road. The Demand included the GIS system mapping photographs of the Hospital Addition upon Windemere and Hospital Roads. Exhibit C.

18. On June 12, 2014 Fidelity's VP/Senior Claims Counsel, Harry M. Wilson, IV denied coverage on the basis: a.legal right of access exists as no conveyance of the road had occurred; and b. the encumbrance attached or was created subsequent to Date of Policy (Fidelity asserting encumbrance attachment was date of issuance to Hospital of Certificate of Occupancy, May 20, 2010; policy issue date April 20, 2010).

19. On September 22, 2014 44 Windemere made demand pursuant to Mass. General Laws Chapter 93A § 9. Said demand included the GIS system maps recording the physical location of the Hospital Addition upon Hospital and Windemere Roads. Exhibit D.

20. On October 21, 2014 Fidelity's VP/Senior Claims Counsel Harry M. Wilson, IV denied the claim **again** based upon the two original reasons and a third asserting that he had examined the Martha's Vineyard Commission Decision DRI No. 324-M and could find no statement "reflecting intent of the Town" to convey its rights in the road, therefore the "right of access" still exists. Exhibit E.

21. On March 6, 2015 a Final Demand was made pursuant to M.G.L. c.93A for both Forty Four Windemere LLC and for James E. Shalek pursuant to the Loan Policy, pursuant to M.G.L. c.93A, without response by the defendants within 30 days. Exhibit E 2.

4

II. <u>CAUSES OF ACTION UNFAIR SETTLEMENT PRACTICES</u>

*<u>Count I. Forty Four Windemere LLC v. Fidelity pursuant to Mass. General Laws c.176D(9)(f)Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear</u>*

a. <u>No Right of Access to the Land</u>.

21. Fidelity has failed to effectuate prompt, fair, and equitable settlement of this matter as liability is reasonably clear on May 16, 2014 based on Covered Risk: 4. No right of access to and from the Land. The claim demand included Exhibits of the Martha's Vineyard Commission GIS Mapping of Windemere and Hospital Roads. <u>Exhibit D</u>. On May 16, 2014 Fidelity failed to provide a prompt, fair and equitable settlement when liability was clear based upon the Covered Risk of: 4. No right of access to and from the Land; The Martha's Vineyard Commision and the Town of Oak Bluffs had rendered a decision and granted building permits in April 2007 regardless of occupancy permitting. These permits gave legal permission to a third party, the Hospital, thereby limiting the Insured's right of access to 44 Windemere prior to the inception of the Policy.

b. <u>Unmarketable Title</u>

22. On May 16, 2014 Fidelity failed to provide a prompt and fair and equitable settlement on the basis that there was liability based upon the Covered Risk of: 3. Unmarketable Title.

23. The Title was Unmarketable due to: (a)encroachment of the Hospital upon public roads; and (b)threat of litigation or substantial expense with potential demand for the removal of encroachments and(c)reasonable doubt as to encumberance, to wit:Marketable title does not mean perfect title but, rather, title free from reasonable doubt; in other words, from doubt

that would cause a prudent person to hesitate before investing his money. *Mishara v. Albion, 341 Mass. 652, 654-655 (1961)*.

*Count II. Forty Four Windemere LLC v. Fidelity pursuant to Mass. General Laws c.176D(9)(d)Refusing to pay claims without conducting a reasonable investigation based upon all available information.*

24. Fidelity refused to pay the claim and failed to conduct a reasonable investigation to determine the following:

     a.   Recorded <u>Decision of Martha's Vineyard Commission DRI 324-M</u> recorded on December 28, 2006, at Dukes Registry of Deeds, Book 1208 Page 896 giving Martha's Vineyard Hospital legal right to apply for permits to build at subject road locations thereby encumbering the Insured's Title and right of access to and from the land.

     b.   Failure to research the Town of Oak Bluffs Building Department issuance of Building Permits in 2007 giving Hospital legal right to build at road locations encumbering the Insured's Title and right of access to and from the land.

*Count III. Forty Four Windemere LLC v. Fidelity pursuant to c. 176D §(n) Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.*

25. Fidelity has failed to provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law because Fidelity asserts that a the Insured's legal right of access has not been terminated by (1)conveyance of the road to the Hospital or (2)coverage is excluded because of the exclusion: 3. Defects liens, encumbrances, adverse claims or other matters: (d) attaching or created <u>subsequent</u> to Date of Policy.

26. Fidelitiy's facts are unreasonable and not in keeping with the policy or law because:

1. Fidelity requires the Insured be denied its legal right of access when in fact the legal right is currently denied pursuant to Massachusetts law. The Insured would be required to drive a vehicle into the building, in effect break the law in order to assert its right to use the road. It does not have the legal right to do so. See Mass. General Laws Chapter 266 Section 120A: " In any prosecution for committing the crime of trespass by parking a motor vehicle upon a private way or upon <u>improved or enclosed land</u>, proof that the defendant named in the complaint was at the time of such parking the registered owner of such vehicle shall be prima facie evidence that the defendant was the person who parked such vehicle upon such way or land at such time."

2. Fidelity's denial based on Certificate of Occupancy occurring after the policy inception date is not in keeping with the title insurance policy or law. Conditions causing encumberances and unmarketable title occurred well prior to the inception date of the Policy. An encumberance is a burden or charge on the property or an outstanding right in a third party, which interferes with the use or transfer of the property or subjects the property to an obligation. The recording of the Commission's Decision on Dec. 20, 2006 and the subsequent issuance of valid building permits in 2007 by the Town of Oak Bluffs gave rights to the Hospital encumbering the Insured's title prior to the issuance of the Policy in 2010.

*Count IV. Forty Four Windemere LLC v. Fidelity pursuant to c. 176D §(g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.*

27. Fidelity's insistence that no coverage is afforded has compelled 44 Windemere to sue in order to obtain Owner's Title Insurance coverage.

7

*Count V. James E. Shalek v. Fidelity pursuant to Mass. General*
*Laws c.176D(9)(f)Failing to effectuate prompt, fair and*
*equitable settlements of claims in which liability has become*
*reasonably clear*

28. Shalek restates paragraphs 21. through 24. above.

*Count VI. James E. Shalek v. Fidelity*
*c.176D(9)(d)Refusing to pay claims without conducting a*
*reasonable investigation based upon all available information.*

29. Shalek restate paragraphs 24. a. and b. above.

*Count VII. James E. Shalek v. Fidelity*
*c. 176D $(n) Failing to provide promptly a reasonable*
*explanation of the basis in the insurance policy in*
*relation to the facts or applicable law for denial*
*of a claim or for the offer of a compromise settlement.*

30. Shalek restates paragraph 25. above.

Count VIII. James E. Shalek v. Fidelity
*176D $(g) Compelling insureds to institute litigation to recover*
*amounts due under an insurance policy by offering substantially*
*less than the amounts ultimately recovered in actions brought by*
*such insureds.*

31. Shalek restates paragraph 27. above.

III. Damages

30. 44 Windemere Road LLC has suffered $2,973,102.07 in damages
as accounted in the attached Exhibit F.

32. The Mortgage from James E. Shalek is unmarketable as the
Title Security is unmarketable. Demand is made for $600,000.00
plus treble damages, attorney fees and costs.

FORTY FOUR WINDEMERE LLC, and
JAMES E. SHALEK,
by their attorney,


Mary Secor Sullivan, Esq.
BBO#547032
Law Office of Mary Sullivan
Box 1873
87 Center St.
Tisbury, Ma 02568
508-687-9929
msullivanlaw@gmail.com

Dated: April 24, 2015



2006 00009474
Bk: 1106 Pg: 1    Doc: DECIS
Page: 1 of 27    12/28/2006 09:32 AM



MARTHA'S VINEYARD
COMMISSION

P.O. BOX 1447 • 33 NEW YORK AVENUE • OAK BLUFFS • MA • 02557
508.693.3453 • FAX: 508.693.7894
INFO@MVCOMMISSION.ORG • WWW.MVCOMMISSION.ORG

# Decision of the
# Martha's Vineyard Commission

# DRI 324-M – Martha's Vineyard Hospital

## 1.    SUMMARY

**Referring Board:**    Board of Selectmen, Town of Oak Bluffs, MA

**Subject:**    Development of Regional Impact #324-M
Martha's Vineyard Hospital

**Project:**    Expansion of Martha's Vineyard Hospital

**Owner:**    Martha's Vineyard Hospital

**Applicant:**    Martha's Vineyard Hospital

**Applicant Address:**    One Hospital Road, Oak Bluffs, MA

**Project Location:**    1 Hospital Road, Oak Bluffs, MA Map 5 Lot 18 (0.13 acres), 5 Lot 20 (0.71 acres, Map 6 Lots 38 (1.43 acres), 39 (0.85 acres), 40 (0.38 acres), 41 (0.11 acres), 43 (0.29 acres), Lot 45, (0.28 acres), and Map 7 Lot 1 (9.8 acres). Deeds - Book 13 Page 151, Book 11 Page 337, Book 242 Page 518, Book 243 Page 338, Book 299 Page 71, Book 495 Page 589, Book 521 Page 546, Book 64 Page 97.

**Description:**    Renovation, expansion and replacement of part of the existing hospital.

**Decision:**    The Martha's Vineyard Commission (the Commission) approved the application for the project as a Development of Regional Impact with conditions, at a vote of the Commission on December 7, 2006.

**Written Decision:**    This written decision was approved by a vote of the Commission on December 14, 2006.

The permit-granting authorities of the Town of Oak Bluffs may now grant the request for approval of the Applicant's proposal in accordance with the conditions contained herein and may place further conditions thereon in accordance with applicable law, or may deny the request for approval.

## 2.  FACTS

The exhibits listed below including the referral, the application, the notice of public hearing, the staff report, the plans of the project, and other related documents are incorporated into the record herein by reference. The full record of the application is kept on the premises of the Martha's Vineyard Commission.

### 2.1   Referral

The project was referred to the Commission on August 1, 2006 by the Board of Selectmen of the Town of Oak Bluffs, MA for action pursuant to Chapter 831 of the Acts of 1977, as amended (the Act) and the Commission's Standards and Criteria Administrative Checklist for Developments of Regional Impact, Sections 3.102b, 3.109f, 3.301a, 3.301b, 3.401, 3.402, and 3.601 and was reviewed as such by the Martha's Vineyard Commission.

### 2.2   Hearings

Notice: Public notice of a public hearing on the Application was published in the Vineyard Gazette, October 20, 2006.

Hearings: The Commission held several public hearings on the Application that were conducted by the Commission at several locations around the Island (noted below) pursuant to the Act and M.G.L. Chapter 30A, Section 2, as modified by Chapter 831 on the following dates.
- The hearing was opened on November 2, 2006 at the High School and testimony was heard.
- The hearing was continued to November 8, 2006 at 6:30 pm at the Katherine Cornell Theater when further testimony was heard.
- The hearing was continued to November 9, 2006 at 7:00 pm at the Old Whaling Church, and, there being no further testimony, the hearing was closed. However the written record was left open until 5:00 pm November 16, 2006.

### 2.3   The Plan

The following plans and documents submitted by the Applicant and contained in the Commission's project file constitute "the Plan."

P1     "A New Beginning: Why Now? Why New? Why so much?" consisting of 4 pages of frequently asked questions and answers with charts giving the basic project rationale of the Martha's Vineyard Hospital, undated.

P2     "Martha's Vineyard Hospital DRI Application: Booklet 1 of 2", consisting of 32 (8.5" x 11") pages of documents including filled out application form, abutter's list, project description, and alternative site cost estimates, prepared by Thomas, Miller and Associates, 5210 Maryland Way, Suite 200, Brentwood, TN 37027 – October 6, 2006.

P3     "Martha's Vineyard Hospital DRI Application: Booklet 2 of 2", consisting of 31 (11" x 17") pages of documents Existing Conditions, Existing Floor Plans, Proposed Site Plan, Proposed Site Improvement Plan, Proposed Landscape Plan, Proposed Roof Garden Plan, Proposed

Floor Plans, Proposed Perspectives, Proposed Elevations, Proposed Sections, Retaining Wall/Guard Rail Details, Siding Case Study, and Computer Generated Before and After Images prepared by Thomas, Miller and Associates , 5210 Maryland Way, Suite 200, Brentwood, TN 37027 – October 6, 2006.

P4 "Martha's Vineyard Hospital: November 8, 2006 Public Hearing Booklet", consisting of 67 (11" x 17") pages of documents including Existing Site Plan, Proposed Floor Plans, Risk Assessment Images from Power Point Slide Show, Traffic and Parking Impacts Images from Traffic Study Power Point Slide Show, Construction Traffic Sequencing Plans, Potential Off-site Construction Staging Locations, Landscaping Plans, Lighting Plans, Building Materials, Rendering From North and West, Elevations, Building Sections, Site Sections, Retaining Wall Details, Computer Generated Before and After Images, and Green Building Initiative Images from LEED Power Point Slide Show, prepared by Thomas, Miller and Associates , 5210 Maryland Way, Suite 200, Brentwood, TN 37027 – November 2, 2006.

P5 "Martha's Vineyard Hospital: November 8, 2006 Public Hearing Booklet", consisting of 25 (11" x 17") pages of documents including Questions and Answers posed the previous Hearing November 2, Preliminary Staff Parking Lot – Phase 1 & 2 Plans, Proposed Landscape Plans, Stormwater Management Plan, Site Improvement Plan, and assorted images on building design, prepared by Thomas, Miller and Associates, 5210 Maryland Way, Suite 200, Brentwood, TN 37027 – November 8, 2006.

P6 "MEMO: Revision to Applicant's Offers", consisting of 1 page of revisions to the applicant's offers, by Marc S. Rowland, AIA ACHA of Thomas, Miller and Associates, 5210 Maryland Way, Suite 200, Brentwood, TN 37027 – November 16, 2006

P7 "Martha's Vineyard Hospital Expansion Traffic Impact and Access Study", consisting of 37 pages, prepared by Fay, Spofford, and Thorndike, 15 Broad Street, Suite 301,Boston, Massachusetts 02109, Suite 200, – September, 2004.

P8 "Traffic Impact Study Update: Martha's Vineyard Hospital Expansion", consisting of 47 pages, prepared by Fay, Spofford, and Thorndike, 15 Broad Street, Suite 301,Boston, Massachusetts 02109, Suite 200, – October, 2006

P9 "Martha's Vineyard Hospital Expansion Traffic Impact Study Update: Technical Appendix", consisting of 251 pages, prepared by Fay, Spofford, and Thorndike, 15 Broad Street, Suite 301,Boston, Massachusetts 02109, Suite 200, – October, 2006

P10 "Final Report: Risk and Vulnerability Assessment Martha's Vineyard Hospital", consisting of 61 pages, prepared at the request of the Martha's Vineyard Hospital and the MVC by Woods Hole Group, Inc., 81 Technology Park Drive, East Falmouth, Massachusetts 02536,– November, 2006.

P11 "Memorandum: Frequency of SLOSH surge events", consisting of 1 page, prepared at the request of the Martha's Vineyard Hospital and the MVC by Woods Hole Group, Inc., 81 Technology Park Drive, East Falmouth, Massachusetts 02536,– November 9, 2006.

P12  "LEED: Leadership in Energy & Environmental Design Presentation for MVH", Consisting of 17 (11" x 17") pages of Images from Power Point Slide Show presented November 16, 2006.

P13  "Geotechnical Engineering Report: Martha's Vineyard Hospital Replacement - File No. 30960-000", consisting of 47 pages of results of subsurface investigations and geotechnical engineering recommendations, prepared by Haley & Aldrich, Inc., 800 Connecticut Blvd., Suite 100, East Hartford, CT 06108, June 21, 2004.

## 2.4   Other Exhibits

E1.   Referral to the MVC from the Oak Bluffs Board of Selectmen, August 1, 2006

E2.   Staff Report, by Paul Foley, MVC DRI Coordinator, with the assistance of other staff members, Date, 2006.

E3.   Review of MVH Traffic Impact and Access Study, by Charles C. Crevo, Ph.D., P.E. of C3 Consulting Group for the Martha's Vineyard Commission, October 26, 2006

E4.   Photographs of the site, taken on May 15, 2006 and August 24, 2006 by MVC staff members, Paul Foley and Mark London.

E5.   Letter from Allison Burger, dated November 14, 2006.

E6.   Letter from A. Conrad Neuman, dated August 18, 2006.

E7.   Letter from Ann Margetson, dated November 15, 2006.

E8.   Letter from Chip and Sarah Graham, dated August 2006.

E9.   Letter from Courtney Brady, dated November 13, 2006.

E10.   Letter from Catherine Brennan, dated November 16, 2006.

E11.   Letter from Chris Fried, dated November 13, 2006.

E12.   Letter from Chris Fried, dated October 23, 2006.

E13.   Letter from Chris Fried, dated November 9, 2006.

E14.   Letter from Catherine and Ann Gordon, dated April 12, 2006.

E15.   Letter from Chris Murphy, dated November 8, 2006.

E16.   Letter from Dana K. Bowers, dated November 15, 2006.

E17.   Letter from David Gross, dated August 24, 2006.

E18.   Letter from David Gross, dated November 16, 2006.

E19.   Letter from Duncan Ross, dated November 2, 2006.

E20.   Letter from Dedie Wieler, dated November 14, 2006.

E21.   Letter from Edith Potter, dated October 27, 2006.

E22.   Letter from Letter from Jeff Donnelly (W.H.O.I.), dated April 28, 2006.

E23.   Letter from Juleann VanBelle, dated November 16, 2006.

E24.   Letter from Kerry Scott, Selectmen, dated November 8, 2006.

E25.   Letter from Marjory Aronson, dated September 29, 2006.

E26.   Letter from Marcia Cini, dated November 10, 2006.

E27.   Letter from Marcia Graham, dated November 1, 2006.

E28.   Letter from Marcia Graham, dated November 15, 2006.

E29.   Letter from Nancy Dole, dated November 8, 2006.

E30.   Letter from Oak Bluffs Historical Commission, dated November 9, 2006.

E31.   Letter from Oak Bluffs Emergency Management, Peter Martel, dated September 29, 2006.

E32.   Letter from Renee Balter, dated November 15, 2006.

E33.   Letter from Roberta Mendlovitz, dated September 14, 2006.

E34.   Letter from Richard Toole, dated November 8, 2006.

E35.   Letter from Sam and Gretchen Feldman, dated November 9, 2006.

E36.   Letter from Victor M. Linn, comments from August 24, 2006.

E37.   Letter from Victor M. Linn, dated August 30, 2006.

E38.   Letter from Victor M. Linn, dated November 16, 2006.

E39.   Letter from the Robert Iadicicco, Oak Bluffs Wastewater Commission, dated November 6, 2006.

E40.   Decision 299 of the Martha's Vineyard Commission for the Hospital's application for parking, dated April 27, 1989.

E41.   Decision 324 of the Martha's Vineyard Commission for Windemere, dated August 30. 1990..

E42.   Decision of the Martha's Vineyard Commission

E43.   Minutes of the Commission's Land Use Planning Committee meeting, May 8, 2006.

E44.   Minutes of the Commission's Land Use Planning Committee meeting, August 14, 2006.

E45.   Minutes of the Commission's Public Information Session, August 24, 2006.

E46.   Minutes of the Commission's Public Hearing, November 2, 2006.

E47.   Minutes of the Commission's Continued Public Hearing, November 8, 2006.

E48.   Minutes of the Commission's Continued Public Hearing, November 9, 2006.

E49.   Minutes of the Commission's Continued Public Hearing, November 16, 2006.

E50.   Final Report of the Commission's Land Use Planning Committee's Post-Public Hearing Review, December 1, 2006.

E51. Minutes of the Commission Meeting of December 7, 2006 – Deliberations and Decision.

E52. Minutes of the Commission Meeting of December 14, 2005 – Approval of the Written Decision.

## 2.5   Summary of Testimony

The following is a summary of the principal testimony given during the public hearing.

- Presentation of the project by Tim Walsh, CEO of the Hospital; Tim Sweet, Vice Chairman of the Board of Trustees; Mark Rowland, architect Thomas Miller Associates; Dan Cress, architect Thomas Miller Associates; Chris Akers, engineer Littlejohn Engineering; and Gary Hebert, transportation engineer with Fay, Spofford, ant Thorndike.
- Staff reports by Paul Foley, MVC DRI coordinator; Bill Wilcox, MVC Water Planner; Mark London, Executive Director.
- Risk Assessment by Leslie Fields of the Woods Hole Group.
- Letters from 36 citizens of Martha's Vineyard.
- Oral testimony from Town Boards or members of Town Boards: Ron D'Orio (Oak Bluffs Selectmen), Roger Wey (Oak Bluffs Selectmen), Kerry Scott (Oak Bluffs Selectmen), John Bradford (Oak Bluffs Planning Board), Joan Hughes (Oak Bluffs Conservation Commission), Peter Martell (Oak Bluffs Director of Emergency Management), Joe Alosso (Oak Bluffs Wastewater Commission), Glenn Hearn (West Tisbury Selectmen), Ted Morgan (Edgartown Selectmen Emeritus), David Wilson (Oak Bluffs Historical Commission).
- Oral testimony from Public: Sam Feldman, Chip Graham, David Gross, Chris Fried, Susan Shea, Richard Toole, Nancy Dole, Cathy Brennan, Patrick King, Steve Bernier, Sylvia Thomas, Allison Burger.

## 2.6   Party Status

- The following individuals and/or groups requested and were granted party status:
  - Catherine Gordon Gross and David Gross of 83 Eastville Avenue.
  - Patrick King on behalf of the Eastville Homeowner's and Taxpayers Association.

## 3.   FINDINGS

## 3.1   Project Description

- The existing hospital is 140,035 square feet (sf) comprising the 1929 Hospital building (31,987 sf), the 1972 Hospital building (62,096 sf) and Windemere (45,952 sf).
- The proposal consists of 10,320 sf of demolition of the 1929 building, 800 sf of demolition of the 1972 building, and a 90,240 sf new addition with two main levels and a smaller basement.
- The new total square footage of the Hospital and Windemere will be 219,155 sf for an increase in square footage of 79,120 square feet.

- There will be an increase in medical/surgical beds of 7 (from 11 to 18), a decrease in maternity beds from 4 to 3, a 5-bed nursery, 3 intensive care rooms, and the addition of 3 observation beds.
- Non-clinical departments will remain in the 1972 wings including physician's offices, Hospice, Vineyard Nursing Association, rehab, administrative offices, records storage, and daycare.
- The Hospital also owns three other small buildings in the immediate area. The "red house" in front of the hospital is used for hospital administration and is part of this application. An adjacent house and another former house on Windemere Road are used by the Hospital for staff housing and the Hospital development office respectively, and are not part of this DRI application.
- There are presently 314 staff members year-round and 344 during the summer at the Hospital and Windemere.
- The Martha's Vineyard Hospital is a private non-profit community hospital. The Hospital has signed a Memorandum of Understanding to work towards an affiliation agreement with Mass. General Hospital.

## 3.2   Findings of Fact

The Commission makes the following findings about the Hospital project.

Location
- The proposal is to build a 90,000 square foot clinical building at an estimated cost of $42 million, while keeping most existing facilities. The Hospital has stated that the total construction cost for rebuilding the entire required 202,000 square foot facility on an alternative site would be $73 million, not counting the cost of land acquisition and inflation due to the delay in construction.
- The Hospital has calculated that replacing administrative and physician offices (planned for the 1972 building) on a new site would require an additional 67,000 square foot support building costing $13 million.
- The Hospital proposes to keep the Windemere nursing home as it is, with minor exterior repairs. The Hospital has estimated that, in order to keep Windemere financially feasible, it would have to move with the Hospital, requiring construction of a 45,000 square foot building costing $12 million. The Hospital has stated "separating the home from the hospital would increase operating costs to a point where the nursing home would not be financially viable".
- An alternate site study carried out by the MVC and the Hospital in early 2006 identified several possible alternative locations near the center of the Island, where facilities would be less exposed to many natural disaster risks, would be more central, and would have more room for parking and expansion. However, it is not clear that any of these properties is available and, if they were, at what cost.
- A proposed relocation would require a zoning amendment which Hospital administrators fear might not be passed at Town meeting as a result of opposition which would likely be raised by neighbors. The Hospital could end up with the current proposal, but with considerable delay and additional expenses related to this delay due to inflation.

- Relocating the Hospital would result in a considerable delay in the project related to: acquisition of a new piece of land, approval of a revised Determination of Need, preparation of new architectural and engineering plans. The Hospital has estimated, based on the Mass Department of Public Health Construction Inflation Index, that this would add 12% to the project cost for each year of delay; so the Hospital contends that the total cost in a new location, assuming a two-year delay, would be $91 million.
- Hospital administrators have stated that it is not financially feasible to move the Hospital and that the choice is not between a new Hospital in either the existing or a new location, but rather, between proceeding with the project as presently conceived, or not proceeding at all.

## Wastewater

- The site is in the Lagoon Pond watershed, a nitrogen-sensitive embayment now under study in the Massachusetts Estuaries Project.
- The existing on-site waste treatment system treats about 12-15,000 gallons per day, with treated effluent going into the ground draining into the Brush Pond sub-watershed, part of the Lagoon Pond watershed. The current plant has had maintenance problems. It will be decommissioned.
- With construction of the new hospital building, wastewater will be pumped off site to the Town of Oak Bluffs treatment facility. The Hospital proposes a flow of up to 12.2 gallons per minute (about 17,500 gallons per day or the design capacity equivalent of 50-55 year-round houses, and up to 80 houses based on actual flow). The town facility has achieved a level of nitrogen reduction about twice as good as the Hospital's plant, and effluent goes into the ocean rather than a nitrogen-sensitive pond.
- The Hospital will pay for the infrastructure for tying in, and is making a one-time contribution of $75,000 to the Wastewater Commission and will pay an annual user's fee that will be used to offset costs that would otherwise have to be borne by current users.
- Tying the Hospital into the town sewer will result in the removal of about 140 kilograms of nitrogen per year currently going into Brush and Lagoon ponds.
- The Oak Bluffs wastewater facility has a design capacity of 370,000 gallons per day and currently handles 165-175,000 gallons on an average midsummer day (220-225,000 on a peak day).
- The Hospital has stated that the capacity exists to connect the two Hospital-owned residences to the wastewater system, if grade allows; however, no facts about other issues affecting sewering these properties was submitted.
- Bio-medical waste will be disposed of off-Island.

## Stormwater

- The amount of impervious area will increase from 5.4 acres to 6.6 acres.
- Roof runoff not absorbed by the roof garden will be directed to discharge within the 100-foot shore zone around the wetlands.
- Some parking and road runoff will discharge to the 100-foot shore zone. It will be treated by passing through the filters prior to discharge.
- The stormwater collection system will be visually inspected on a quarterly cycle and maintained as needed. A hydraulic inspection (pipe and structure) will be done on an annual basis.
- During construction, silt fences are proposed between work areas and wetlands along both sides of the entry road and along the Brush Pond wetlands.

## Open Space, Habitat, Landscaping

- The Hospital has estimated that open space on the 13-acre site will diminish from 7-acres (55%) to 5-acres (40%).
- This is not a Natural Heritage and Endangered Species Program estimated or priority habitat site.
- The proposed location for the new building is largely on the parking lot in front of the 1929 building, but requires demolishing the front portion of that building.
- This building location requires extensive fill and retaining walls to raise the building to the same ground floor level as the existing building and out of the 100-year flood plain. The front access road and associated parking areas will also be elevated.
- A retaining wall to support the raised elevation of the area in front of the new building and to separate the new road from the wetland buffer will be about 10-feet high at its highest point and will be topped with a guardrail.
- There will be a 50' wide vegetated buffer along Beach Road. The parking area extending along the entrance drive will be landscaped with native plants.
- New landscaping will use primarily low maintenance and native plants to minimize the need for fertilization and watering.
- The Hospital has stated that it has a budget of $150,000 for landscaping.

## Lighting

- New lighting will be designed and existing lighting will be upgraded to prevent up-lighting and light from spilling off the property. Exterior light fixtures will use metal halide bulbs. Pole heights will not exceed 12 feet.

## Energy and Sustainability

- The new hospital building has been registered with the United States Green Building Council in the LEED (Leadership in Energy and Environmental Design) certification program. The Hospital will be the first LEED certified building on the Island and possibly the first LEED certified hospital in the Commonwealth of Massachusetts.
- The Hospital is prepared to carry out additional LEED related efforts if it receives additional funding for them.

## Access

- The Hospital will continue to have two access points, the main entrance from Beach Road and the side entrance from Eastville Avenue.
- A perimeter road is proposed that would allow access to any part of the site from either access point.
- A new emergency access will be created at the end of Temahigan Avenue, to allow access should Beach Road and Eastville Avenue become inaccessible due to exceptional storm conditions.

Traffic
- The number of trips on an average summer weekday in 2026 with the proposed expansion computed in the Traffic Impact Analysis (prepared by Fay, Spofford and Thorndike and reviewed by C3 Consulting) is projected to increase gradually from 2,460 (half in and half out) to 3,851, due to increased use related to population growth. The number during the morning peak is projected to increase from 168 to 263.
- Traffic levels are projected to increase by 2-3% on most surrounding streets.
- The Hospital has offered to implement a series of traffic mitigation measures.

Parking
- Currently, there are 260 public parking spaces (and 22 unmarked and utility vehicle spaces). The projected parking demand is 338 spaces in the short term and 360 spaces in the long term.
- The proposal is to bring the number of parking places to 270 spaces on the existing site.
- The Hospital has estimated that it would cost approximately $5 million to build parking under the Hospital building and this would result in a significant delay due to the need to redesign the project. It has estimated that it would cost approximately $3 million to build a two-level parking structure. The Hospital also stated that since there is not sufficient exterior space to accommodate such a structure, this would require demolition of a wing of the building, which would require some facilities to move off-site which would impact the Hospital's operations.

Multi-User Path
- The Multi-User Path  – to accommodate bicycles, pedestrians, and other non-motorized forms of transportation – will be relocated to provide for a totally exclusive path through the hospital property, to be linked (by others) to an off-road Multi-User Path joining Vineyard Haven and Oak Bluffs.

Building Design, Scenic Values, Character and Identity
- The proposed building will be visually prominent, especially from the harbor and Beach Road. The ground level where the front of the building is to be built is to be raised ten feet and the proposed building height is forty feet (fifty feet to the top of the tower). Also, the building is about 200 feet wide and is about 200 feet closer to Beach Road than the existing 1929 building.
- The proposed exterior elevations are being redesigned to be completely in brick in order to comply with the Coastal Construction Code, requiring ability to withstand 120 mph winds. The architects plan to submit revised exterior elevations in mid-December 2006.

Housing
- During the summer the Hospital has 33 housing units available that are used to house up to 63 seasonal employees. During the winter they have 18 units and house 34 employees. The hospital spends more than $600,000 a year on housing for its employees. The Applicant has indicated that it is in the early stages of planning to build housing to accommodate their needs.
- The Hospital estimates that this expansion will increase the number of employees by 2 in the short term and 4 new employees in ten years.
- The Hospital has stated that, due to the economics and availability of on-Island housing, the majority of the off-Island construction work force will commute daily to the Island and not add to

the need for housing on the Island. Only a small supervisory staff will be housed on-Island for the duration of construction.

Risk from Natural Hazards

- A risk and vulnerability assessment for the Hospital was performed by the Woods Hole Group using the methodology outlined for the Risk and Vulnerability Assessment Tool prepared by the National Oceanic and Atmospheric Administration's Coastal Services Center. This methodology involves ranking hazards in terms of severity of impact, identifying areas at risk from the natural hazards, and then assessing vulnerability to the risks. A second more detailed vulnerability component was added to assess damages to critical hospital services and systems that might impact the performance objective of the hospital. The following findings are based on that report.
  - Based on the size of the impact zone, the frequency of the hazard, and the potential magnitude of the impact, the highest-ranking hazards were found to be storm surge and flooding, wind, and snowfall. Other hazards evaluated include wildfire, coastal erosion, sea-level rise, and earthquakes.
  - Estimates of flooding caused by nor'easters and hurricanes during the 10-, 50-, and 100-yr storms were obtained from the FEMA Flood Insurance Study, derived using high water marks recorded during historical storms. Flood elevations for the 10-, 50-, and 100-yr storms were 4.1, 7.0, and 8.5 ft, respectively. The ground floor of the existing Hospital as well as the new building is 17.5 ft.
  - Worst-case storm surge elevations were obtained from the US Army Corps of Engineers Southern Massachusetts Hurricane Evacuation Study. Maximum surge elevations predicted by the SLOSH computer model for Category 1, 2, 3, and 4 hurricanes were 6.7, 10.6, 14.5, and 16.9 ft, respectively. These surge elevations represent the highest possible flooding that could occur from critical combinations of hurricane track direction, forward speed, landfall location, and high astronomical tide. Storm surges above 7.2 ft have never been recorded in Vineyard Haven Harbor for over a hundred years. Potential frequency of occurrence estimates for the Category 1, 2, 3, and 4 surge levels was computed based on historical hurricane wind speeds. Although direct correlations between hurricane wind speed and storm surge cannot be made, the frequency estimates based on wind speed provide an upper limit to the probability of surge events at the hospital site. Actual frequencies of Category 3 and 4 surge levels predicted by the SLOSH model are considered low enough to be statistically insignificant (for example, the likelihood that a storm would produce a surge higher than elevation 14.5 ft is roughly 1 in 650; in 100 years from now, assuming sea level rise of 2', the likelihood would rise to roughly 1 in 200.)
  - Per the Massachusetts State Building Code, the design wind load velocities for Martha's Vineyard are 90 mph. FEMA's Coastal Construction Manual recommends more stringent wind load design criterion of 120 mph for construction projects within this area of the coastal zone.
  - Predictions for future rates of global sea-level rise were obtained from the International Panel on Climate Change (2001). Over the period 1990 to 2100, these estimates range between 0.29 and 2.9 ft.
  - The Woods Hole Group estimated the risks associated with flooding and storm surge hazards on the performance objective of the Hospital to continue to operate and serve the

island community with a minimum of disruption, both during and immediately after a natural hazard emergency. They concluded that the risk and associated vulnerability to flooding and storm surge during SLOSH Category 1 and 2 hurricanes was low. Mitigation activities including site grading and building upgrades to meet the more stringent 120 mph wind load recommended by FEMA, were found to reduce risks and vulnerability associated with the SLOSH Category 3 events to low. Because of the extremely low probability of occurrence, risks associated with the SLOSH Category 4 hurricane event were also found to be low.

- Although the Vineyard did not have any category 3 hurricanes in the last fifty years, it had three in the two years before that.
- The Hospital has worked closely with the Oak Bluffs Emergency Manager to prepare and continually update an Emergency Management Plan.
- The Hospital agreed to implement all the recommendations of the Woods Hole Group report to mitigate the risk from natural hazards.

Construction Process
- The Hospital has outlined a three-year construction process showing what work will take place and how access and parking will be organized in each of four phases (see Conditions).
- The total estimated quantity of fill material is 23,000 cubic yards. 17,000 cubic yards of this will be obtained from an on-island source such as Goodale Construction. 6,000 cubic yards (aggregate base and processed gravel sub-base material for under the concrete slabs and bituminous paving) will come from off-island sources by barge.

## 3.3   Statutory Authority

The purpose of the Commission, as set forth in Section 1 of the Act, is to "protect the health, safety and general welfare of island residents and visitors by preserving and conserving for the enjoyment of present and future generations the unique natural, historical, ecological, scientific and cultural values of Martha's Vineyard which contribute to public enjoyment, inspiration and scientific study by protecting these values from development and uses which would impair them, and by promoting the enhancement of sound local economies."

The Commission has reviewed the proposal as a Development of Regional Impact, using the procedures and criteria that the Commission normally uses in evaluating the benefits and detriments of such a proposal. The Commission has considered the Application and the information presented at the public hearing, including listening to all the testimony presented and reviewing all documents and correspondence submitted during the hearing and review period.

## 3.4   Benefits and Detriments

Based on the record and testimony presented therein, the Commission finds the following pursuant to Sections 14 and 15 the Act.

## A. THE COMMISSION FINDS THAT THE PROBABLE BENEFITS OF THE PROPOSED DEVELOPMENT WOULD EXCEED THE PROBABLE DETRIMENTS, AS EVALUATED IN LIGHT OF THE CONSIDERATIONS SET FORTH IN SECTION 14(a) OF THE ACT.

## A1 The Commission finds that the proposed development at this location is appropriate in view of the available alternatives (Section 15(a) of the Act.)

The Commission finds that this expansion raises many concerns including the risk of natural hazards, parking, impact on abutters, and scenic values. Nevertheless, the Commission finds that these detriments have been mitigated to some extent, and they are outweighed by the benefit that will be afforded to the entire Martha's Vineyard community of having a new, state-of-the-art, health-care facility, as well as other positive features of this proposal.

Location: Expanding the Hospital on the existing site compared to relocating it in a hypothetical new mid-Island location, offers the following potential benefits.

- It allows continued use of most existing buildings including Windemere and the 1972 section.
- According to Hospital estimates, it would cost less than the cost of moving to a new location.
- By not moving, the project would avoid delay related to: acquisition of a new piece of land, approval of a revised Determination of Need, and preparation of new architectural and engineering plans.
- The project would not be subject to the uncertainty related to obtaining a zoning change, as would be required in an alternative location.
- On this site, there is no impact on significant habitat, whereas rebuilding on a mid-Island site might involve habitat destruction.
- On this site, it is relatively easy to tie into the sewer system, whereas this might likely be more difficult for a site located in the center of the Island.
- This site is an already developed, infill, "Smart Growth" location, especially compared to major new development in a rural area.
- This site is on three bus routes and on one of the Island's main bike paths.
- It is the Hospital's historic location and the community is used to it being here.
- Helicopter access to the helipad takes place over water, which is preferred compared to flight paths over trees or residential areas.
- It is a beautiful setting for a Hospital.

However, this location has the following potential detriments compared to a hypothetical alternative location near the center of the Island.

- The current site and its access roads are exposed to the risk from storm-related natural hazards, although this risk has been mitigated to some extent by modifications to the Hospital plan and with the Oak Bluffs Emergency Management Plan.
- Fitting all the Hospital's requirements into this constrained site has resulted in considerable alteration to the site.
- The Hospital construction and operations will negatively impact the surrounding neighborhood, although it is unknown how many people would be similarly impacted in an alternative location.
- Rebuilding on this site does not allow for creating an all-new facility that is efficiently planned and does not involve continued use of several partially deteriorated buildings.

- Rebuilding on the same site leads to many logistical challenges and expenses related to maintaining Hospital operations during construction, requiring elaborate phasing, staging and coordination and resulting in inconvenience and disruption to patients, employees, abutters, and passers by.
- Construction may overlap with the construction of the Drawbridge, adding to disruption in the area.
- It is not centrally located for the convenience of the public and access by emergency vehicles.

## A2 The Commission finds that the proposed development would have a minimal impact upon the environment relative to other alternatives (Section 15(b) of the Act).

Wastewater and Groundwater: The Commission finds that the project offers the following potential benefits:

- All the Hospital's wastewater will be treated at the Town's wastewater plant, which should halve the amount of nitrogen released into the eco-system; the remainder will be released into the ocean rather than the nitrogen-sensitive Brush and Lagoon Ponds.
- The Hospital will make a significant one-time contribution and annual payments to the Wastewater Commission that will allow freezing the rates for taxpayers for quite a few years.
- Will allow decommissioning the Hospital's existing wastewater treatment facility, thereby relieving the Hospital from the responsibility and cost associated with its maintenance
- Filters will be installed in all catch basins to deal with hydrocarbon and other sediments in runoff.
- The Hospital will monitor the stormwater system.

The Commission notes the following potential detriments.

- The Hospital will use almost 5% of the capacity of the Town's wastewater treatment facility that otherwise could have been used to treat the wastewater of homes and businesses that presently have no nitrogen reduction.
- The project site will generate large volumes of runoff from the increased impervious areas.

Open Space, Natural Communities, and Habitat: The Commission finds that the project offers the following potential benefits.

- The project is not in a critical habitat area.
- The wastewater improvements would positively impact the natural environment of Brush and Lagoon ponds.

The Commission notes the following potential detriments.

- Many trees will be cut and much screening vegetation removed, notably along the entry road and in front of the 1929 building.
- Re-grading close to wetlands raises concern, though extensive mitigation measures have been proposed and will be reviewed by Oak Bluffs Conservation Commission.

<u>Night Lighting and Noise:</u> The Commission finds that the project offers the following potential benefits.
- All exterior lighting will be down-lighting.
- Noise should be limited, except during construction.

The Commission notes the following potential detriments.
- The new building will be highly visible at night because of light shining from windows.

<u>Energy and Sustainability:</u> The Commission finds that he Hospital will incorporate extensive energy efficiency and other sustainability measures that will make it one of the few LEED-certified hospitals in the United States.

## A3 The Commission finds that the proposed development would have a moderate overall <u>effect upon other persons and property</u> (Section 15(c) of the Act).

<u>Traffic and Transportation:</u> The Commission finds that the project offers the following potential benefits.
- The internal site vehicular circulation is much improved with a road layout that provides access to all parts of the site from both entrances.
- An off-road Multi-User Path is incorporated in the plan.
- There are many positive transportation mitigation measures

The Commission notes the following potential detriments.
- It is difficult to provide all of the required parking on the existing site in a cost-effective way.
- There will be additional truck traffic and related disruption during construction, not only in the immediate vicinity, but also at the intersection of Barnes Road and the Edgartown – Vineyard Haven Road.

<u>Scenic Values, Character, and Identity:</u> The Commission finds that the project offers the following potential benefits:
- The building will be an important public building for Martha's Vineyard, easily identifiable as the community's hospital.
- The compact, two-story design limits the amount of land needed to accommodate the program.

The Commission also notes the following potential detriments:
- The height and width of the new building and its proximity to Beach Road will result in much greater visual impact from land and sea.
- The visual impact as seen from Beach Road will be increased because of the removal of some existing vegetation in front of the building,
- The new Hospital building will be a large institutional building close to historic and residential areas.

<u>Impact on Abutters:</u> The Commission finds that the project has the following potential detriments:
- Abutters will be significantly impacted short term, during the construction process.
- The greatly increased visibility of the building as well as the increases in vehicular traffic will also impact abutters.

<u>Risk from Natural Hazards:</u> The Commission finds that the project offers the following potential benefits:

- The new Hospital building will be designed and constructed to be much less vulnerable to damages caused by natural hazards than the existing Hospital.
- The new Hospital has been designed to mitigate, to some extent, the risks from natural hazards by a series of design features and other measures.

The Commission also notes the following potential detriments:

- Because of its location close to the coast, the Hospital, parking facilities, and access roads will be exposed to some risk from flooding during storms and from other natural hazards,
- The risk from storm surge may increase during the lifespan of the building due to possible climate change.

<u>Construction Process:</u> The Commission finds that the project offers the following potential benefits:

- The project may contribute to the local economy by providing jobs to local subcontractors and workers, and providing business to local suppliers and retailers.

The Commission also notes the following potential detriments:

- The construction will have a significant impact on Hospital operations, users, and staff; these impacts will be partially mitigated with the proposed measures.
- The construction will have a significant impact on abutters.

## A4 The Commission finds that the proposed development would have a neutral impact upon the supply of needed low and moderate income housing for Island residents (Section 15(d) of the Act).

The Commission finds that the Hospital continues to make a significant effort to house its staff and the Commission counts on its good faith to do this in the future.

## A5 The Commission finds that the proposed development would have minor impacts on the provision of municipal services or burden on taxpayers in making provision therefore (Section 15(e) of the Act).

The Commission finds that the Hospital will be tied into town sewer at the Hospital's expense. The Commission notes that the Hospital will use some of the capacity of the town wastewater treatment and that the expansion of the Hospital will place additional ongoing demands on town services such as police and fire.

## A6 The Commission finds that the proposed development would use efficiently and not unduly burden existing public facilities (other than municipal) or those that are to be developed within the succeeding five years. (Section 15(f) of the Act).

The Commission finds that the project will allow the Hospital – a quasi-public facility – to better serve the needs of the Martha's Vineyard community with a new, first-class, medical facility. The Commission notes that the construction process will place demands on the Steamship Authority operations, though the impact on the public will be partially mitigated by the fact that most of this transportation is being scheduled to take place at off-peak times of the year.

**A7 The Commission finds that the proposed development does not interfere with the ability of the municipality to achieve the objectives set forth in the municipal general plan. (Section 15(g) of the Act).**

The Commission notes that the project is consistent with the Oak Bluffs Master Plan. The Commission also notes that the Oak Bluffs Board of Selectmen supports the proposal.

**A8 The Commission finds that the proposed development would not contravene land development objectives and policies developed by regional or state agencies. (Section 15(h) of the Act).**

The Commission notes that the development is consistent with the policies of the Martha's Vineyard Commission Regional Policy Plan, adopted by the vote of the Martha's Vineyard Commission, June 1991.

- *I-29.* "Use capital planning to focus on human services, health care, mental health needs and environmental protection and enhancement."
- *III-20.* "Recognize the roles of the MV Hospital and MV Community Services and other human services agencies on Martha's Vineyard."
- *IV-39* "Scrutinize proposals for development near ponds, streams, wetlands, and public water supplies for strict adherence to groundwater protection regulations."

In sum, after careful review of the plan and its attendant submittals and the testimony presented by the Applicant and others, and the addition of conditions such as those relating to wastewater and future traffic mitigation, the Commission has concluded that the probable benefits of this proposed development in this location exceed its probable detriment in light of the considerations set forth in section 14(a) of the Act.

**B. THE COMMISSION FINDS THAT THE PROPOSED DEVELOPMENT WOULD BE CONSISTENT WITH THE LAND DEVELOPMENT OBJECTIVES OF THE COMMISSION, AS EVALUATED IN LIGHT OF THE CONSIDERATIONS SET FORTH IN SECTION 14(b) OF THE ACT.**

The requested project, as a whole, advances the Commission's land development objectives, as outlined in the Martha's Vineyard Commission Regional Policy Plan adopted by the Commission in June 1991, and as noted previously in section A8 of this decision.

**C. THE COMMISSION FINDS THAT THE PROPOSED DEVELOPMENT IS CONSISTENT WITH MUNICIPAL DEVELOPMENT ORDINANCES AND BY-LAWS, TO THE BEST OF THE COMMISSION'S KNOWLEDGE.**

The Commission finds that the current Hospital site conforms to the Oak Bluffs zoning for a Health Care District. Since the Hospital has more than 100,000 square feet, it will require a Special Permit from the Oak Bluffs Board of Appeals. Demolition or construction for health care purposes on map 5, lot 20 may only take place if the Town of Oak Bluffs modifies its zoning regulations to allow such development.

**D. THE COMMISSION FINDS THAT THE SITE IS IN CONFORMANCE WITH THE REGULATIONS OF DISTRICTS OF CRITICAL PLANNING CONCERN, AS EVALUATED IN LIGHT OF THE CONSIDERATIONS SET FORTH IN SECTION 14(d) OF THE ACT.**

The Commission finds that the proposed development site is located within the Lagoon Pond District of Critical Planning Concern (DCPC) and the Coastal DCPC. The Commission notes that it appears that the proposal is consistent with the Lagoon Pond DCPC and is specifically allowed in the Oak Bluffs Coastal DCPC, though it is up to the Oak Bluffs Building Inspector to make the final determination.

## 4. DECISION

The Martha's Vineyard Commission deliberated about the application at a duly noticed meeting of the Commission held on December 7, 2006, and made its decision at the same meeting.

The following Commissioners, all of whom participated in all hearings and deliberations on this project, participated in the decision on December 7, 2006.
- Voting in favor: James Athearn (E – Edgartown), John Best (E – Tisbury), John Breckenridge (A – Oak Bluffs), Christina Brown (E - Edgartown), Martin Crane (A – Governor Appointee), Mimi Davisson (E – Oak Bluffs), Mark Morris (A – Edgartown), Chris Murphy (A – Chilmark), Katherine Newman (A –Aquinnah), Ned Orleans (A – Tisbury), Megan Ottens-Sargent (E – Aquinnah), Jim Powell (A – West Tisbury), Doug Sederholm (E – Chilmark), Linda Sibley (E – West Tisbury), Paul Strauss (County Comm. Rep.), Andrew Woodruff (E – West Tisbury)
- Voting against: None
- Abstentions: None

Based on this vote, the Commission approved the application for the project as a Development of Regional Impact with the conditions listed in section 5 below.

This written Decision is consistent with the vote of the Commission on December 7, 2006 and was approved by vote of the Commission on December 14, 2006.

## 5. CONDITIONS

After reviewing the proposal for this Development of Regional Impact, the Martha's Vineyard Commission imposes the following conditions in order to increase the benefits and minimize the detriments of the project. The analysis of benefits and the resulting decision to approve the project is based on the proposal as modified by these conditions. These conditions form an integral and indispensable part of this decision.

These conditions are an essential part of this decision and shall be enforced as written. If the Commission finds it necessary to seek judicial relief to enforce the condition, the Applicant, or its successors in title at the time of such proceedings, shall pay the Commission's attorney's fees and costs incurred in obtaining judicial relief.

## 1   Risk from Natural Hazards

1.1   As offered by the Applicant, the emergency generator and fuel tank shall be elevated 18", above the SLOSH predicted surge level of 14.6 ft (NGVD) for a Category 3 hurricane event.

1.2   As offered by the Applicant, the perimeter access road shall be redesigned near Eastville Avenue to allow access to the hospital during a Category 3 event as predicted by the SLOSH model (i.e. raised 1-2 feet in some areas).

1.3   As offered by the Applicant, the design of the building shall be upgraded to meet wind loads of 120mph, as recommended by FEMA's Coastal Construction Manual.

1.4   As offered by the Applicant, an emergency access shall be created to provide direct access to the perimeter road from the end of Temahigan, to be used only in case access via Beach Road and/or Eastville Avenue are temporarily blocked.

1.5   As offered by the Applicant, the Hospital shall modify the evacuation plan throughout the phasing of the construction process and upon completion of construction, in cooperation with the Oak Bluffs Emergency Management Director.

## 2   Wastewater

2.1   As offered by the Applicant, all wastewater shall be pumped off site and treated at the Town of Oak Bluffs wastewater treatment facility, at the expense of the MV Hospital.

2.2   As offered by the Applicant, the existing on-site wastewater treatment plant shall be decommissioned, demolished, and removed

2.3   A Waste Stream Management Plan shall be submitted to and is subject to the approval of the LUPC. This plan shall clarify and detail how discharge of toxic and hazardous materials in the wastewater shall be minimized.  The plan shall include RCRA listed wastes and identify appropriate Best Management Practices (BMP) to assure that solvents, photographic chemicals, radionuclides, surplus, unused or formulary-changed pharmaceuticals and commingled or potentially toxic wastes are properly categorized, handled and disposed in a manner that will not adversely impact the operation of the Oak Bluffs Wastewater Treatment facility.

## 3   Groundwater And Stormwater Management

3.1   As offered by the Applicant, all existing and proposed stormwater catch basins shall be fitted with ABTech's Ultra-Urban filters model DI2020N or equivalent.

3.2   As offered by the Applicant, roof runoff not absorbed by the roof garden shall be directed to discharge within the 100-foot shore zone around the wetlands.

3.3   As offered by the Applicant, all runoff from parking and road discharging into the 100-foot shore zone shall be treated by passing through the filters prior to discharge.

3.4   As offered by the Applicant, the stormwater collection system will be visually inspected on a quarterly cycle and maintained as needed; a hydraulic inspection (pipe and structure) will be done on an annual basis. [Note: modified by condition 3.10]

3.5 As offered by the Applicant, the Hospital shall enforce its Sedimentation and Erosion Plan, which lists steps that subcontractors must follow to minimize impacts from erosion.

3.6 As offered by the Applicant, silt fences shall be installed and maintained between work areas and wetlands along both sides of the entry road and along the Brush Pond wetlands.

3.7 As offered by the Applicant, a final Sedimentation and Erosion Control plan shall be submitted to and is subject to the approval of the Oak Bluffs Conservation Commission before the start of construction. [Note: modified by condition 3.9]

3.8 As offered by the Applicant, a final Stormwater Management Plan including a detailed management program and final location of stormwater discharge points shall be submitted to and is subject to the approval of the Oak Bluffs Conservation Commission before the start of construction. [Note: modified by conditions 3.9 and 3.10]

3.9 The final Sedimentation and Erosion Control plan and final Stormwater Management Plan shall be submitted to and is subject to the approval of the LUPC before the start of construction.

3.10 The Stormwater Management Plan shall include the following elements.
- Address the current runoff discharge near the tank farm, the planned use of the two catch basins near the entrance to the helicopter pad and provide sufficient design elements to clarify the planned runoff from the 1.9 acre impervious surface parking and road area in a manner to maximize even distribution to the natural vegetation.
- Clearly identify all catch basins that will be fitted with UltraUrban Filters as per condition 3.1.
- Replacement of the Ultra-Urban filters at intervals no greater than one year and removal of grit and debris from the screen at quarterly intervals. The plan shall clarify the chain of responsibility for stormwater system maintenance. Maintenance reports shall be submitted to the MVC.
- Design detail for planned surface stormwater discharges along Hospital Road including the use of riprap, level lip spreaders or vegetated berms to evenly distribute the runoff into the natural vegetation.
- Design detail on dispersing roof water in manner that prevents erosion in the Shore Zone.
- Design detail on any proposed structures (both vegetative and structural) that differ from the Stormwater management Plan dated 7/27/06.

3.11 The Hospital shall only use environmentally sound de-icing materials such as calcium chloride, CMA, sand and similar products on the roadways and parking surface.

3.12 The Hospital shall not re-surface the paved parking area with asphalt sealers or coal tar sealers, to prevent runoff containing PAH pollutants.

## 4 Multi-User Paths, Bicycles, and Pedestrians

4.1 As offered by the Applicant, there shall be an exclusive Multi-User Path (MUP) through the Hospital property via continued use of Linton Lane. The driveway to the hospital's red house will be converted to a paved bike path as shown in the Plan The Applicant agrees to grant a

permanent easement for this MUP to enable possible MassHighway funding for the construction. In addition, there shall be a shared bike route along the perimeter road of the campus.

4.2   As offered by the Applicant, the Hospital shall grant a permanent easement along the right-of-way of Eastville Avenue to allow an appropriately sized and buffered MUP to be created in the future at other's expense.

4.3   As offered by the Applicant, the Hospital shall provide the following to accommodate bicycles:
- Incorporate bicycle storage facilities for at least 50 bicycles dispersed at several locations on the Hospital campus, close to the busiest staff/volunteer building access points.
- Design the new perimeter road and clearly post it to allow staff and visitor bicyclists to 'share the road'.
- Provide showers and locker rooms for employees to encourage commuting by bicycle.
- Provide employee incentives to bike to work, especially during the peak season.
- Post signs with regularity along the perimeter road to caution parking motorists to back out slowly and watch for bicyclists.
- Consider a financial contribution to the design of future bikeway enhancements between the Lagoon Pond Drawbridge and the Hospital campus.

## 5   Architecture

5.1   As offered by the Applicant, a final design for the exterior of the building clad in brick shall be submitted to and is subject to the approval of the Commission before the issuance of the building permit. The design shall be substantially as shown in the plans previously submitted except that the exterior materials shall be brick and stone, and there may be modifications to the architectural detailing (e.g. gables, fenestration, trim, colors, etc.) including limited changes to the building articulation.

## 6   Landscaping

6.1   As offered by the Applicant, a final landscape plan for each area of the site, shall be submitted to and is subject to the approval of the Commission before beginning the landscaping of that area. The areas to be landscaped shall be substantially as shown on the preliminary landscape plan but with provision of: denser vegetation, screening for abutters, protection of wetlands, softening of the visual impact of the building from the public way, tree canopy and planted breaks in parking areas, and preservation of existing trees where possible. [Note: modified by condition 6.4]

6.2   As offered by the Applicant, primarily native and low-maintenance plants shall be used in the areas proposed for new landscaping, to minimize the need for fertilization and watering.

6.3   As offered by the Applicant, all fertilizers shall be slow-release, water-insoluble nitrogen source types. No synthetic pesticides including herbicides, fungicides and insecticides shall be used in the maintenance of landscaping.

6.4   The final landscape plan shall also clarify the following items:

- the design and the grading of the Multi-User Path,
- the screening of all retaining walls and parking areas, and
- pedestrian paths for links from Beach Road to the main entrance, from Eastville Avenue to the side entrance, from parking areas to Hospital entrances, and from the Hospital to Brush Pond;
- signage;
- parking and access arrangements for abutters as outlined in the 1989 MVC Decision;
- explore the redesign of the intersection of Hospital Road and Beach Road, introducing a curve into the entry road in order to minimize the visual impact of the building.

## 7   Exterior Lighting

7.1   As offered by the Applicant, a final lighting plan for the all buildings and exterior areas shall be submitted for the review of and is subject to the approval of the LUPC.

7.2   As offered by the Applicant, all new and existing exterior lighting shall be downward shielded to prevent direct light from spilling off the property.

7.3   As offered by the Applicant, lighting pole heights shall not exceed 12-feet.

7.4   The final plan shall identify what exterior areas might have lighting turned off at night and how this might be done.

## 8   Noise

8.1   As offered by the Applicant, solid walls screened with vegetation shall be installed to reduce the impact of the noise generated by the new chillers in the mechanical yard.

## 9   Energy / Sustainability

9.1   As offered by the Applicant, the new building shall be registered with the United States Green Building Council in the LEED (Leadership in Energy and Environmental Design) certification program.

9.2   As offered by the Applicant, the new building's compliance with the Massachusetts Energy Code shall be documented using ComCheck software and the architectural envelope shall exceed the minimum Energy Code requirements by at least 15%

9.3   As offered by the Applicant, all lighting fixtures and bulbs will be Energy Star.

9.4   As offered by the Applicant, the project shall include a roof top garden and other roof systems to reduce heat generation;

9.5   As offered by the Applicant, the Hospital shall provide preferred parking spots for hybrid vehicles and carpooling vehicles.

9.6   As offered by the Applicant, the Hospital has committed to contract 35% of its electrical energy use from renewable wind power and solar through energy facilities in the south.

9.7   As offered by the Applicant, during construction there will be an indoor air quality plan.

9.8    Where appropriate, the Hospital shall purchase Energy Star appliances and office equipment.

## 10   Solid Waste Management

10.1   As offered by the Applicant, the new facility shall provide for the collection and storage of the Hospital's recyclables.

10.2   As offered by the Applicant, the Hospital shall encourage recycling of as much material as possible before and during demolition.

10.3   As offered by the Applicant, the Hospital shall remove asbestos using appropriate removal, handling, and disposal techniques.

10.4   As offered by the Applicant, at least 75% of demolition debris shall be recycled.

10.5   As offered by the Applicant, bio-medical waste shall be disposed of off the Island.

## 11  A.D.A. Accessibility

11.1   As offered by the Applicant, the project shall be A.D.A. compliant

## 12  Traffic and Transportation

12.1   As offered by the Applicant, the Applicant shall increase its efforts to encourage hospital workers and volunteers to bike/walk to and from the Hospital or use existing Martha's Vineyard Transit Authority services during and after construction and the peak summer months.

12.2   As offered by the Applicant, the Applicant shall provide economic incentives to workers to use alternative modes to get to the hospital to reduce the potential that the supply of parking becomes overburdened.

12.3   As offered by the Applicant, during construction, the Applicant shall maintain or increase the existing parking supply on the overall campus, particularly during the summer months.

12.4   As offered by the Applicant, the Applicant shall schedule services (e.g., AA meetings) at alternative times such that peak parking demands (typically occurring from 11am – noon) are reduced.

12.5   As offered by the Applicant, the Applicant shall delineate staff parking such that staff will not occupy higher turnover parking spaces. It may be necessary for the Hospital to implement a system to enforce staff parking. [Note: modified by condition 12.12]

12.6   As offered by the Applicant, the internal roadway speed limit shall be retained at 10 mph and the Applicant shall consider 'traffic calming' features on the new perimeter hospital road to deter 'cut-through' traffic and speeding.

12.7   As offered by the Applicant, the Hospital shall incorporate the potential new MVTA bus stop at the hospital entrance on the plan and continue to accommodate the bus stops on Beach Road.

12.8 As offered by the Applicant, the portion of the driveway approaching Eastville Avenue shall be widened between the rear parking areas and the front parking area to provide a 20-foot wide paved cross-section.

12.9 As offered by the Applicant, the telephone pole just east of the emergency driveway shall be relocated back further from the edge of the road (preferably at least 6 feet behind its current location).

12.10 All roads on the Hospital site shall be no more than 20' wide, except in areas where parked cars back into the road where they shall be no more than 24' wide.

12.11 The Hospital shall work with the Town of Oak Bluffs, MassHighway, and the Martha's Vineyard Commission to determine what safety improvements, if any, should be made to the intersection of Eastville and Temahigan avenues. The Hospital shall contribute a share of the Town of Oak Bluffs' costs for this improvement, if any, based on the proportion that the Hospital contributes to the need for this improvement.

12.12 The Hospital shall set up a system to ensure that staff members do not park in visitors parking.

12.13 In addition to the parking shown on the site plan located on the main Hospital property (south of Eastville Avenue), the Hospital shall provide additional parking for at least 60 cars, either on or off site, before the issuance of a certificate of occupancy. The proposed location and design of any additional parking facilities – including discussion of alternatives ways to accommodate the parking, as well as ways to reduce the needed number of spaces through use of programs to encourage alternative modes of transportation – shall be subject to the approval by the Commission prior to the construction of these parking facilities.

## 13. Construction Process

13.1 As offered by the Applicant: construction work will be performed on Monday through Friday, excluding holidays observed in the construction industry and by the Hospital, from 7:00 am to 6:00 pm. Some exception to this schedule will occur for a limited number of activities such as finishing concrete slabs.

13.2 As offered by the Applicant, limitations will be set on the number of major pieces of construction equipment operating at any one time. Equipment operation will be strictly restricted to within the 7:00 am to 6:00 pm work period. Excessive idling of equipment not in use will not be permitted. Where possible, equipment will be located so as to minimize noise impact in the surrounding area. At all times noise levels will be maintained within OSHA requirements.

13.3 As offered by the Applicant, on-site parking for the construction workers will be restricted to within the designated construction area. Parking on site will be limited to one personal vehicle per subcontractor. Parking for the personal vehicles of all other construction workers will be located at the designated off-site staging area(s) and shuttle service will be provided.

13.4 As offered by the Applicant, the Hospital shall use the following measures to encourage hiring of local sub-contractors and workers:

- During the subcontractor bidding process, notifications will be published in the local newspapers, as well as in the Dodge Construction Reports.
- A location will be established at the existing Hospital where the final bid documents can be viewed by interested subcontractors from the Island.
- All legitimate bids from qualified subcontractors will be received and considered. The subcontractors selected for the project, whether local or off-Island, will be required to receive and seriously consider applications from qualified members of the local workforce, for their specific trade categories, whether it be skilled or unskilled.
- Applications for such positions will be available and will be received at the on-site Construction Office throughout the project construction period.

13.5    As offered by the Applicant, the Hospital shall notify all contractors and sub-contractors of the weight limitations on the Lagoon Pond Drawbridge, shall require that trucks exceeding these limits use the alternative truck route as defined by the Oak Bluffs and Tisbury Boards of Selectmen.

13.6    The Hospital shall prepare a Construction Management Program for on- and off-site staging and construction, in order to maximize safety, to minimize the disruption of Hospital operations, to minimize noise, vibrations and other impacts of construction on users, staff and abutters, to reduce exhaust emissions, to set up clear lines of communications between the construction team and the community, to ensure the provision of adequate parking, and to ensure the presence of safe pedestrian and bicycle paths and to comply with the provisions of the Oak Bluffs Selectmen as outlined in their letter of November 15, 2006. This plan shall be submitted to and is subject to the approval of the Oak Bluffs Board of Selectmen or the responsible town authority designated by the Board of Selectmen.

13.7    No parking of construction vehicles, storage of equipment, or staging of materials will be permitted on the two properties owned by the Hospital on Windemere Road.

13.8    No demolition or construction for health care purposes shall take place on map 5, lot 20, unless and until the Town of Oak Bluffs amends its zoning by-law to permit such development.

In the case of the detailed plans to return to the Commission or other entities for approval (the Waste Stream Management Plan, the Stormwater Management Plan, the Sedimentation and Erosion Control Plan, the Exterior Architectural Design, the Landscape Plan, the Lighting Plan, the Construction Management Program, and the additional 60-space parking lot):
- The final proposals shall maximize the benefits and minimize the detriments at least to the same extent as in the Plan approved in this decision (including the preliminary plan for the Temahigan staff parking lot dated November 9, 2006);
- The Commission's, or other entity's, approval shall be documented by a certificate of compliance, to be issued in recordable form, which shall be recorded in the Registry of Deeds prior to the issuance of a building permit; a copy of such Certificate of Compliance shall also be mailed by the Commission to the Oak Bluffs Building Inspector, who shall thereafter be free to act upon the building permit or occupancy permit application.

## 6.  CONCLUSION

### 6.1  Permitting from the Town

The Applicant must, consistent with this Decision, apply to the appropriate Town of Oak Bluffs Officers and Boards for any local development permits which may be required by law.

### 6.2  Notice of Appellate Rights

Any party aggrieved by a determination of the Commission may appeal to Superior Court within twenty (20) days after the Commission has sent the development Applicant written notice, by certified mail, of its Decision and has filed a copy of its Decision with the Oak Bluffs Town Clerk.

### 6.3  Length of Validity of Decision

The Applicant shall have two (2) years from the date of receipt of the Decision of the Martha's Vineyard Commission contained in this document to begin substantial construction, namely obtaining a building permit (not only a foundation permit) and beginning construction within 6 months. Should substantial construction not occur during said two-year period, this Decision shall become null and void and have no further effect. Any appeal of this decision shall extend the time needed to obtain a final judgment and to resolve any appeals therefrom. This time period may be extended for good cause upon written request from the Applicant and written approval from the Martha's Vineyard Commission.

### 6.3  Signature Block

*Linda B Sibley*

Linda B. Sibley, Chairman

*Dec 20, 2006*

Date

### 6.4   Notarization of Decision

Commonwealth of Massachusetts
County of Dukes County, Mass.

On this __20th__ day of __December__ __2006__, before me,
__Jo-Ann Taylor__, the undersigned Notary Public, personally
appeared __Linda Sibley__, proved to me through satisfactory evidence of
identity, which was/were __driver's license__ to be the person(s)
whose name(s) was/were signed on the preceding or attached document in my presence, and who
swore or affirmed to me that the contents of the document are truthful and accurate to the best of
his/her/their knowledge and belief.

_____
Signature of Notary Public

Printed Name of Notary __Jo-Ann Taylor__
My Commission Expires __February 11, 2011__

### 6.5   Filing of Decision

Filed at the Dukes County Registry of Deeds, Edgartown, on: _____

Deed - Book __, page __

Attest
_Dianne E. Powers_ Register

Exhibit "B"

HOSPITAL RD

BP-2008-0053

COMMONWEALTH OF MASSACHUSETTS
TOWN OF OAK BLUFFS

# BUILDING PERMIT

PERMISSION IS HEREBY GRANTED TO

SOLAR MAIN CONSTRUCTION

at 17 HOSPITAL RD

ISSUED ON: ... 2008     AMENDED ON: ...     EXPIRATION: 02-16-2008

TO PERFORM THE FOLLOWING WORK:

POST THIS CARD SO IT IS VISIBLE FROM THE STREET

THIS PERMIT MAY BE REVOKED BY THE TOWN OF OAK BLUFFS UPON VIOLATION OF ANY OF ITS RULES AND REGULATIONS

Signature

May 12, 2014

Claims Department
Fidelity National Title Group
601 Riverside Ave.
Building 5; Fourth floor
Jacksonville, FL
32204

RECEIVED

MAY 16 2014

CLAIMS
DEPARTMENT

RE: File Number: 4821-03-3200
     Policy Number: 82306-80391861

Dear Sir or Madam:

I am writing to make a claim against the above mentioned Policy for property located at 44 Windemere Road in Oak Bluffs, Massachusetts.

The claim specifically refers to paragraph 4 which states "No right of access to and from the Land"

The property fronts on a Town owned road named "Windemere". In recent years the Martha's Vineyard Hospital constructed an expansion to the hospital building. We have discovered that the new expansion was constructed over the Town owned road named Windemere. The Town never conveyed any interest in the road to the Hospital and no other access to our property was provided for without trespassing on the land of other people.

I have attached with this letter a copy of our policy and three plans of Windemere Road. There is an areal photo showing the hospital expansion and highlighted in yellow is Windemere Road passing under the hospital building. The result of this is that we have no access to the property. We have spoken the Partners Health Care who owns the hospital and they have been non responsive. Clearly we no longer have access and the hospital has expanded over land not owned by them. The fee to the roads is with the Town of Oak Bluffs. This construction had begun prior to our taking title to the property and should have been noted on our title. If we had known at the time we would never have bought the property, but we relied on the lawyer and your title policy.

An appraiser has told us that our value has decreased by 80% as a result of this and we have suffered considerable financial damage. We therefore look to you insurance for compensation.

The Town does not deny the facts nor does the Hospital and the Lawyer who wrote the policy did not find this significant error in our title search. He should have discovered this.

Please advise us how you intend to resolve this matter.

Sincerely yours,

Fred Walters
917 Chestnut Street
Waban, MA
02468

Email; fred@fredwalters.net
Telephone: (774) 392-0959

 **Fidelity National Title Insurance Company**

Harry M. Wilson, IV · (904) 854-8780 · Fax: (904) 633-3060 · Reece.Wilson@fnf.com

June 12, 2014

**VIA U.S. MAIL AND EMAIL**
**AT fred@fredwalters.net**
Fred Walters
917 Chestnut St.
Waban, MA 02468

RE:   Claim No.:          489245
      Insured:            Forty Four Windemere LLC
      Policy No.:         82306-80391861
      Property Address:   44 Windemere Rd.
                          Oak Bluffs, MA 02557

Dear Mr. Walters:

I am claims counsel for Fidelity National Title Insurance Company ("The Company") and the referenced matter has been referred to me for claims administration. I understand you tendered this claim on behalf of Forty Four Windemere LLC, the insured owner under the above referenced owner's policy of title insurance. My understanding of the facts giving rise to this claim is as follows:

On or about April 12, 2010 Forty Four Windemere LLC (the "Insured Owner") acquired the subject property by virtue of a deed from Gregory B. Joseph and Casper R. Joseph, Jr. of even date recorded at the Dukes County Registry of Deeds in Book 1208, Page 896. In connection with the acquisition of the property by the Insured Owner, the Company issued its Owner's Policy of title insurance number 82306-80391861 in favor of Forty Four Windemere LLC with a date of policy of April 16, 2010 and policy limits of $1,175,000.

The subject property fronts on a town road called Windemere. The sprawling Martha's Vineyard Hospital complex occupies nearby property. Per your claim letter, this claim arises because in recent years the hospital constructed an expansion to the hospital building. The expansion runs over the town road of Windemere, blocking access to your property. The Town never conveyed any interest in the road to the Hospital and no other access to your property was provided without trespassing on the land of others. Per your claim letter, construction of this expansion was completed after you acquired the property, though it was apparently underway at the time of the purchase.

As such, you contend that the facts here trigger the Policy's "Covered Risk" number 4 which insures against loss or damage incurred by reason of *"no right of access to and from the Land."*

In order to determine coverage, a review of the totality of the policy is necessary, including all applicable exceptions and exclusions. Additionally, it is necessary to review the meaning of the relevant "Covered Risk" triggered by the claim. Here, you are insured against loss or damage attributable to "no **right** of access to and from the Land." In the instant case, however, no one has denied any legal "right" of access to your property over the public right of way as insured under the policy. Clearly, as reflected in the aerial map you provided, the hospital improvements substantially encroach onto Windemere Road and impede your access to the property. What the policy insures, however, is the legal "right" of access. As there has been no conveyance from the town to the hospital, your legal "right" to use the road is still intact and enforceable. The policy insures precisely such "right" and, even though for practical purposes the encroachments of the hospital may block access, as we understand it no one has challenged your legal "right" to use the road. As such, we must respectfully deny your claim at this time. However, should any party assert that the publics' rights to the roadway do not exist, please let us know and we will re-evaluate coverage.

However, there is an additional reason that we believe this claim is excluded from coverage. I direct your attention to paragraph 3(d) of the "Exclusions from Coverage" which provides:

> *The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:*
>
> *3. Defects, liens, encumbrances, adverse claims or other matters:*
>
> \* \* \*
>
> *(d) attaching or created subsequent to Date of Policy.*

Here, we understand that the hospital's construction project which results in the blockage of Windemere Road was completed only after the Date of Policy here. As such, the complained of encroachment necessarily occurred after the policy date of April 16, 2010, and falls under the above exclusion.

If you are aware of any additional information which might alter the above analysis or conclusion, provide such information or documentation to the Company as soon as possible. If I do not receive such information or documentation within thirty (30) days of the date of this letter, your claim file will be closed.

Please note that reference to any particular provision of the policy in this letter shall not be construed as a waiver of any other term or provision of the policy. The Company retains the right to supplement this letter. Also, please be advised that the Company reserves the right to deny liability for this matter based on other or additional grounds.

Please contact the undersigned should you have any additional questions regarding this matter. Please include the above-referenced claim number in all communications with the Company.

Very truly yours,

Harry M. Wilson, IV
VP/ Senior Claims Counsel

*Exhibit D*

**Larkosh & Jackson LLP**
**Box 9000, PMB #193**
**20 Meshacket Road**
**Edgartown, MA 02539**

*Daniel J. Larkosh
**Linda M. Jackson
*Also Licensed in CA
**Managing Partner

Phone (508) 939-9500
Fax (508) 939-9501

September 22, 2014.

VIA CERTIFIED MAIL

Attorney Harry M. Wilson, IV
VP/Senior Claims Counsel
Claims Administrator
Fidelity National Title Group
601 Riverside Avenue, Bldg. 5, 4th flr.
Jacksonville, FL 32204

C T Corporation System
Registered Agent for Fidelity National
Financial, Inc.
101 Federal Street
Boston, MA 02110

RE:     Your Claim Number:     489245
        Your Insured:          Forty Four Windemere LLC
        Policy No.:            82306-80391861
        Property Address:      44 Windemere Rd.
                               Oak Bluffs, MA 02557

Dear Attorney Wilson:

This is a formal demand letter sent to you pursuant to Massachusetts General Laws Chapter 93A, Section 9. This firm represents Forty Four Windemere LLC, a beneficiary under a title insurance policy issued by Lawyers Title Insurance Company (hereinafter "Insurance Company").

Forty Four Windemere LLC is a domestic limited liability company duly organized on April 8, 2010 in the Commonwealth of Massachusetts with a principal place of business located at 354 Pleasant Street, W. Bridgewater, MA. Lawyers Title Insurance Company is a subsidiary of Fidelity National Financial, Inc., a Florida corporation registered to do business in the Commonwealth of Massachusetts on or about May 19, 2003, with its principal office located at 601 Riverside Ave., Jacksonville, FL. At the times herein mentioned, Forty Four Windemere LLC owned the real property at 44 Windemere Rd., Oak Bluffs, MA.

On or about December 14, 2006, the Martha's Vineyard Commission approved an application for the renovation, expansion and replacement of the Martha's Vineyard Hospital. This plan and decision were a matter of public record and recorded in the registry of deeds at Book 1106, page 1. The plan eliminated a portion of Windemere Road which is the access for the insured's

property.

On or about April 12, 2010, Forty Four Windemere LLC acquired the property on 44 Windemere Road. On April 16 Fidelity issued and delivered to Forty Four Windemere LLC a title insurance policy, insuring Forty Four Windemere LLC against any loss to its interest in the real property as a result of loss or damage attributable to "no right of access to and from the Land." (Emphasis added.) Forty Four Windemere LLC, the insured, paid to Fidelity the designated premium for the policy. Fidelity delivered of the policy to Forty Four Windemere LLC.

Forty Four Windemere subsequently built a new home on the premises and was issued a certificate of occupancy on January 19, 2012. However, when Fidelity's insured attempted to market and sell the new home, it discovered that the hospital plan and subsequent construction eliminated their sole right of access via Windemere Road. Presently, the sole access to the home is over a private driveway owned by the hospital, which is currently being used subject to the unwritten permission of the hospital. This has placed a cloud over the future right of access to the property should the hospital decide it no longer wishes to allow the use of its driveway.

A group of neighbors initially attempted to rectify this issue themselves. Initially, the hospital appeared amenable to restoring the right of access; however, in early 2014 the matter went before the Oak Bluffs board of selectmen and there was no resolution.

This leaves your insured with no present legal "right" of access because access is currently by permission only. Converting this permissive use into a legal "right" (easement) puts a significant legal burden on your insured. The burden of proving every element of an easement by prescription rests entirely with the claimant. Ivons-Nispel, Inc. v. Lowe, 347 Mass. 760, 762 (1964). If any element remains unproven or left in doubt, the insured will not prevail. See Mendonca v. Cities Serv. Oil Co., of Pa., 354 Mass. 323, 326 (1968). See also Tinker v. Bessel, 213 Mass. 74, 76 (1912), quoting from Cook v. Babcock, 11 Cush. 206, 210 (1853) ("The acts of the wrongdoer are to be construed strictly and the true owner is not to be barred of his right except upon clear proof."). Use of an access way by permission does not mature into a legal right of access, and so the difference between the two is legally material, resulting in a diminution of value in the subject property. Spencer v. Rabidou, 340 Mass. 91, 93 (1959). Unlike a legal right of access, a permissive use can be revoked at any time. Additionally, it would take twenty years of adverse use before the hospital's driveway could be claimed as an easement. M.G.L. c. 187, § 2.

On May 12, 2014, your insured made a claim under the title insurance policy. On June 12, 2014, Fidelity denied the claim based on two arguments 1) that an exclusion applied because the defect was created subsequent to the issuance of the policy and 2) the hospital had presently not withdrawn its permission to use the driveway.

As a result of the loss by Forty Four Windermere LLC of its legal "right" to access via a public way, your insured has been unable to sell its property. As a result of Fidelity's refusal to pay the claim or use reasonable efforts to restore the insured's access, Forty Four Windemere LLC retained my services in the collection of the claim against Fidelity.

Fidelity has never denied that the policy of insurance provides coverage for this type of loss. Additionally, you are aware that while the hospital's current permission allows the insured to reach the property for the time being, there is still a loss in the legal "right" of access which has greatly diminished the value of your insured's property. This is because the hospital's permission to use its private driveway is not a legal "right" of access. Yet, after reviewing such claim and documentation Fidelity has failed to make any offer of settlement.

Fidelity's refusal to make any offer to resolve this claim is in bad faith given the evidence which places the loss within the coverage of the policy. Fidelity has generally engaged in unfair claims settlement practices in violation of M.G.L. c. 93A and M.G.L. c. 176D, section 3 in the following respects, among others:

- By unreasonably and summarily denying benefits due to Forty Four Windermere LLC under the contract of insurance which is contrary to available evidence;
- By misrepresenting pertinent facts relating to coverages at issue;
- By failing to provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of the claim;
- By denying benefits due to Forty Four Windermere LLC under the contract of insurance when your coverage for the loss is clear;
- By ignoring pertinent documents of record, facts, witnesses and insurance policy provisions relating to the claim at issue;
- By denying the claim without a reasonable and adequate investigation;
- By unreasonably refusing to make any offer to settle this claim at issue;
- By failing to settle this claim promptly; and
- By generally engaging in unfair claims settlement practices including making no offer to settle this claim which forces Forty Four Windermere LLC to institute litigation.

M.G.L. Chapter 93A section 9 further provides a remedy for unfair claims settlement practices and such violations of chapter 176D. Chapter 176D, section 3(9) provides that an unfair claim settlement practice shall consist of any of the following:

    a.    Chapter 176D, section 3(9)(f) -- failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear. Liability in this case is reasonably clear, and Fidelity has failed to make any reasonable offer despite the fact that my client's loss is proven by the documentation it has

submitted.

    b.    Chapter 176D, section 3(9)(g) – compelling the insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured. Fidelity's failure to offer to pay Forty Four Windermere LLC anything given its loss and Fidelity's knowledge regarding the nature of the loss is exactly the type of conduct the statute was designed to prevent.

Upon information and belief, all of the above-described actions were performed willfully and knowingly. As a result of Fidelity's unfair and deceptive acts and practices, Forty Four Windermere LLC has suffered in addition to the loss of benefits rightfully due to it. In light of the foregoing, Forty Four Windermere LLC demands that Fidelity immediately pay it the policy limit of $1,175,000.

Under Chapter 93A, Fidelity has thirty (30) days from your receipt of this letter to respond with a reasonable offer of settlement. If it fails to do so, that statute provides that Fidelity will be liable for multiple damages and the reasonable attorney fees incurred by Forty Four Windermere LLC for the prosecution of this action. I would be pleased to speak with you regarding a resolution of this claim.

Sincerely yours,

Dan Larkosh
Attorney at Law

 **Fidelity National Title Insurance Company**

Harry M. Wilson, IV · (904) 854-8780 · Fax: (904) 633-3060 · Reece.Wilson@fnf.com

October 21, 2014

**VIA U.S. MAIL AND EMAIL**
**AT mylawfirm@aol.com**
Daniel J. Larkosh, Esq.
Larkosh & Jackson LLP
Box 9000, PMB # 193
20 Meshacket Road
Edgartown, MA 02539

| | | |
|---|---|---|
| RE: | Claim No.: | **489245** |
| | Insured: | Forty Four Windemere LLC |
| | Policy No.: | 82306-80391861 |
| | Property Address: | 44 Windemere Rd. |
| | | Oak Bluffs, MA 02557 |

Dear Mr. Larkosh:

We are in receipt of your correspondence dated September 22, 2014 which letter represents a formal demand letter pursuant to Massachusetts General Laws Chapter 93A, Section 9. We understand that you represent Forty Four Windemere LLC, the insured owner under the above referenced Owner's policy of title insurance. Your letter was written in response to our coverage letter dated June 12, 2014 in which, for the reasons discussed below, Fidelity National Title Insurance Company (the "Company") denied coverage for your client's title insurance claim. In short, the main reason for our denial was that your client's "right" to access the subject property remains intact even though a portion of a hospital building encroaches onto the town road that provides access to the subject property. No party, including the Town of Oak Bluffs or hospital, has challenged this right.

A discussion of the factual background here is useful. On or about April 12, 2010 Forty Four Windemere LLC (the "Insured Owner") acquired the subject property by virtue of a deed from Gregory B. Joseph and Casper R. Joseph, Jr. of even date recorded at the Dukes County Registry of Deeds in Book 1208, Page 896. In connection with the acquisition of the property by the Insured Owner, the Company issued its Owner's Policy of title insurance number 82306-80391861 in favor of Forty Four Windemere LLC with a date of policy of April 16, 2010 and policy limits of $1,175,000.

On May 12, 2014 Forty Four Windemere tendered a claim to the Company arising from allegations that improvements recently built in connection with the expansion of Martha's Vineyard Hospital encroach onto Windemere Road, therefore blocking access

to the property located at 44 Windemere Road, Oak Bluffs, Massachusetts. In specific, the claim letter tendered by Fred Walters, whom we understand to be the managing member of the Insured Owner, states as follows:

> We have discovered that the new expansion was constructed over the Town owned road named Windemere. _The Town never conveyed any interest in the road to the Hospital and no other access to our property was provided for without trespassing on the land of other people._ (emphasis added)

Per your client's claim letter, construction of this expansion was completed after the acquisition of the property, though construction was apparently underway at the time of the purchase.

We denied your client's claim for two reasons. First, while we acknowledged that the policy contains a "Covered Risk" provision insuring loss or damage attributable to "no **right** of access to and from the Land." However, we pointed out here that no one has denied any legal "right" of access to your property over the public right of way as insured under the policy. As reflected in the aerial map you provided, the hospital improvements substantially encroach onto Windemere Road and impede access to the property. What the policy insures, however, is the legal "right" of access. As your client's claim letter points out, there has been no conveyance from the town to the hospital of any portion of the road. As such, we observed that your client's legal "right" to use the road is still intact and enforceable. The policy insures precisely such "right" and, even though for practical purposes the encroachments of the hospital may impede access, as we understand it no one has challenged your client's legal "right" to use the road.

As a second reason for denying coverage, we also cited to paragraph 3(d) of the "Exclusions from Coverage" which provides:

> The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
>
> 3. Defects, liens, encumbrances, adverse claims or other matters:
>
> &#42; &#42; &#42;
>
> (d) attaching or created subsequent to Date of Policy.

Here, we understood that the hospital's construction project which resulted in the blockage of Windemere Road was completed only after the Date of Policy here. As such, the complained of encroachment occurred after the policy date of April 16, 2010, and falls under the above exclusion.

In attempting to refute our denial of coverage, your demand letter raises one new issue that we had not previously considered, as follows:

*On or about December 14, 2006, the Martha's Vineyard Commission approved an application for the renovation, expansion and replacement of the Martha's Vineyard Hospital. This plan and decision were a matter of public record and recorded in the registry of deeds at Book 1106, page 1. The plan eliminated a portion of Windemere Road which is the access for the insured's property.*

Based on this statement in your demand letter, we reviewed the Martha's Vineyard Commission Decision on DRI No. 324-M, as recorded at Book 1106, Page 1 of the Dukes County Registry. We could not locate any statement within that decision that reflected the intent of the Town to convey its rights in the town road of Windemere to the Hospital or to otherwise relinquish its rights in the road. On a related note, we also searched the Registry to determine if there was any other recorded taking of a portion of Windemere Road that would have terminated the public's "right" to use any portion of Windemere Road. We could not locate any such taking and this is consistent with your client's statement from his claim tender that "the Town never conveyed any interest in the road to the Hospital."

Given that we can locate nothing of record to suggest this "right" of access over Windemere Road was conveyed away or relinquished by the town, we conclude that the right still exists. While we acknowledge that the hospital improvements appear to block a portion of Windemere Road, thereby preventing your client's access to and from the subject property by way of Windemere Road and requiring that your client transit a private road owned by the hospital to access its property, we nonetheless believe our previous denial of your client's claim was appropriate. From what we understand, your client's "right" of access is intact despite this physical encroachment by the Hospital's building improvements. A title insurance policy only insures that such a right of access exists and we believe such rights existed here at the time your client's policy was issued and still exists as of this writing.

While we again deny your client's claim, please advise us should any party assert that the insured's rights to the roadway do not exist or that there is a taking or conveyance of Windemere Road of record. We will then re-evaluate coverage accordingly.

If you are aware of any additional information which might alter the above analysis or conclusion, provide such information or documentation to the Company as soon as possible. If I do not receive such information or documentation within thirty (30) days of the date of this letter, your claim file will be closed.

Please note that reference to any particular provision of the policy in this letter shall not be construed as a waiver of any other term or provision of the policy. The Company retains the right to supplement this letter. Also, please be advised that the Company reserves the right to deny liability for this matter based on other or additional grounds.

Please contact the undersigned should you have any additional questions regarding this matter. Please include the above-referenced claim number in all communications with the Company.

Very truly yours,

Harry M. Wilson, IV
VP/ Senior Claims Counsel

**MARY SECOR SULLIVAN, ESQ.**
**LAW OFFICE MARY SULLIVAN**
**P.O. BOX 1873-87 CENTER ST.**
**TISBURY, MA 02568**
**508-687-9929**
msullivanlaw@gmail.com

Mr. Harry M. Wilson, IV
Fidelity National Title Insurance Company
Lawyers Title Insurance Corporation
Fidelity National Title Insurance Company
601 Riverside Avenue
Building Five, Fourth Floor
Jacksonville, Fl 32204

and

Legal Department, Division of Insurance
1000 Washington St, Suite 810
Boston, MA 02118

**BY FAX: (904) 633-3050**

March 6, 2015

RE: <u>Claim No. 489245 Forty Four Windemere LLC
Renewing and Supplementing Demand Pursuant to Mass.
General c. 93A and Initiating Demand with Companion Loan
Policy No. 82307-80483792</u>

Dear Mr. Wilson:

I represent Insured Forty Four Windemere LLC, the Insured
under Lawyers Title Owner's Policy of Title Insurance Policy No.
82306-80391861 and James E. Shalek, the Insured under Lawyers
Loan Policy No. 82307-80483792.

I.   <u>*Lawyers Title Owner's Policy Demand*</u>

This is a further demand for payment of $1,750,000 under the
Owners policy for the additional Covered Risks of:

➤2. Any Defect in...or encumbrance[1] on the Title.
➤A defect in the Title caused by (ii) failure of any person or
Entity to have authorized a conveyance.
➤3. Unmarketable Title.
➤4. No right of access to and from the Land.

## II. *Lawyers Title Loan Policy Demand*

Demand is made for payment of $600,000 Loan Policy[2] limit to
the Insured James E. Shalek on the basis of Covered Risks as
enumerated in the Lender's Policy(same as Owner's stated above,
except unmarketability risk also includes inability to sell
mortgage and note).

### A. *Coverage is afforded under both the Title and Loan Policies based upon any defect in title due to encumberance and 4. No right of access to and from the Land*.

Both Title and Loan policies Schedules B **do not except**:
Marthas Vineyard Commision DRI 342 M recorded[3] at Dukes County
Registry of Deeds Book 0116 Page 1, or Building Permits issued
in 2007 by the Town of Oak Bluffs for the Site Improvements and
construction upon Hospital and Windemere Roads.

The recording of the Martha's Vineyard Commission's Decision on
Dec. 20, 2006 and the subsequent issuance of valid building
permits in 2007 by the Town of Oak Bluffs granted valid legal
rights to Martha's Vineyard Hospital well before the Policy

---

[1] An encumberance is a burden or charge on the property or an
outstanding right in a third party, which interferes with the
use or transfer of the property or subjects the property to an
obligation. The State of Marketable Title, By S.H. Spencer
Compton, Senior Vice President and Special Counsel First
American Title Insurance Company of New York,
www.http://www.firstamny.com/ Feb. 28, 2015.

[2] A policy of title insurance insuring the interest of a lender. Fidelity National Title
Insurance Company,Words, Phrases and Definitions.
www.http://www.fntic.com Feb. 28, 2105

[3] Ibid. **Record** - To incorporate into the public records of the County Recorder; also, the system of public records
imparting constructive notice of title to claims, or interests, in real property. **Recording** - The act of filing documents for record in
the office of the County Recorder.

deal fairly and in good faith, with your policyholders. Your treatment of this claim has not followed that course. Your actions have been to act as if the house is on fire, but coverage is denied because the insured did not specifically state a claim for smoke damage.

Again, demand is made by 44 Windemere LLC Inc. for the policy limit of $1,750,000 based upon the Covered Risks stated above.

Again, demand is made by James E. Shalek for $600,000 as his loan is unmarketable and the security is diminished due to the Title issues.

We await your positive and timely response.

Respectfully,


Mary Secor Sullivan, Esq.

Enclosures: May 2014 Claim Letter with attachment GIS Survey Hospital Windemere Roads; Fidelity Denials June 12 and Oct. 21, 2014; 93A Demand Letter September 22, 2014; 93A Complaint with Attachments Exhibits: Warrant Article Withdrawal.

*Exhibit "F"*

**FORTY FOUR WINDEMERE**

| Acct. # | | | | | |
|---|---|---|---|---|---|
| | PURCHASE PRICE | $ | 725,000.00 | | |
| | CONSTRUCTION COSTS (utilities, maintenance, staging): | $ | 507,255.54 | | |
| 6030 | AUCTION (JJ Maning) | $ | 17,170.00 | $ | 1,232,255.54 Hard costs |
| 6040 | BANK SERVICE FEES (04/30/2010 to 07/31/2013) | $ | 280.00 | | |
| 6220 | CLOSING COSTS (at purchase and re-finance) | $ | 24,196.05 | | |
| 6300 | DEPRECIATION: (2012-2013) | $ | 36,492.00 | | |
| 6100 | INSURANCE: (through 2014) | $ | 13,981.08 | | |
| 6195 | INTEREST PAID TO EDGARTOWN BANK: (through 12/31/2014) | $ | 154,049.94 | | |
| 6195 | INTEREST PAID TO JOSEPHS: | $ | 51,520.56 | | |
| 6230 | OFFICE EXPENSES (04/20/2010 to 02/21/2012) | $ | 211.05 | | |
| 6200 | PROFESSIONAL FEES (Legal & accounting 04/08/2010 to 12/23/2014) | $ | 29,454.94 | | |
| 6330 | REAL ESTATE TAXES (07/02/2010 to 01/02/2015) | $ | 33,834.05 | | |
| 6350 | RENTAL EXPENSES: (2012-2014) | $ | 3,590.17 | | |
| 6250 | RENTAL MAINTENANCE & REPAIRS (7/21/14 to 10/8/2014) | $ | 1,065.00 | | |
| 6340 | RENTAL UTILITIES (10/04/2012 to 01/20/2015) | $ | 11,477.28 | | |
| 6330 | TAXES: Other (Annual Corp filing fee 2011-2014) | $ | 2,050.00 | $ | 379,372.12 Soft costs |
| | TOTAL COSTS TO DATE | $ | 1,611,627.66 | $ | 1,611,627.66 |
| | | | | | |
| 8000 | RENT INCOME (11/9/2012 to 1/22/2015) | $ | (109,384.00) | | |
| | | | | | |
| | TOTAL | $ | 1,502,243.66 | | |

DUE

| | | | |
|---|---|---|---|
| Edgartown Bank | $ | 1,200,000.00 | |
| JW Harding/Shalek Loan | $ | 270,358.41 | * |
| Walters | $ | 500.00 | |

    IWH  $  870,358.41  M. Lynch & credit cards
    JES  $ -600,000.00  repaid at re-financing
         $  270,358.41  Difference*

$ 2,973,102.07

Interest Due JES Anticipated payoff date 12/31/2015 used to calculate     $     510,564.00
TOTAL DUE                                                                  $   3,483,666.07